**Mary Ann VANCE, Plaintiff–Appellant,**

v.

**SOUTHERN BELL TELEPHONE AND TELEGRAPH COMPANY, a Georgia Corporation, Defendant–Appellee,**

**Joyce Foskey, et al., Defendants.**

**No. 87–3625.**

United States Court of Appeals, Eleventh Circuit.

Jan. 23, 1989.

---

Charles Cook Howell, III, Michael S. O'Neal, Gardner Davis, Scott Fortune, Jacksonville, Fla., for plaintiff-appellant.

Guy O. Farmer, II, Jacksonville, Fla., Daniel J. Thompson, Atlanta, Ga., for defendant-appellee.

Before HILL and FAY, Circuit Judges, and DAVIS *, District Judge.

FAY, Circuit Judge:

Plaintiff-appellant Mary Ann Vance appeals the district court's order granting the defendant Southern Bell Telephone and Telegraph Company's motion for judgment notwithstanding the verdict ("JNOV") and in the alternative for a new trial. *Vance v. Southern Bell Tel. and Tel. Co.*, 672 F.Supp. 1408 (M.D.Fla.1987). A jury awarded Vance compensatory and punitive damages after a four day trial based on the plaintiff's claim that her employer, Southern Bell, discriminated against her on the basis of race in violation of 42 U.S.C. § 1981 (1982). The district court judge found that reasonable jurors could not have arrived at a verdict for the plaintiff, and granted the defendant's motion for JNOV. In addition, the court held that had it not granted the JNOV, it would have granted the defendant a new trial, because the relief provided by the jury was contrary to

---

* Honorable Edward B. Davis, U.S. District Judge for the Southern District of Florida, sitting by designation.

the great weight of the evidence, and because the damages awarded were grossly excessive. On appeal, the plaintiff contends that the JNOV and the alternative grant of a new trial were improper, because the jury verdict was supported by substantial evidence. After a thorough review of the record, we reverse the order granting the defendant's motion for JNOV. However, we affirm the district court's alternative holding granting a new trial.

## I. *Background*

Plaintiff Mary Ann Vance, a black woman, began working for Southern Bell in March, 1972, as a switchboard operator. Thereafter, she held various jobs at other Southern Bell locations throughout Jacksonville, Florida. Although Vance missed some time from work due to illness, she generally had a good employment record. In 1984, Vance bid for a job at Southern Bell's Western Way facility in Jacksonville as a material services coordinator. The job provided higher pay, but was considered a step down in job classification because it entailed work in a warehouse. Prior to her transfer to Western Way, Vance had never complained of any racial discrimination at Southern Bell.

Vance began work at the Western Way facility on August 13, 1984 in the CONECS department under the supervision of Paul Wagner, a first-level supervisor. About a week after Vance began work in this department, she found what appeared to be a noose hanging from the light fixture above her work station. At the time of this incident there were several "imports," or temporary personnel working at Western Way. At trial, Vance testified that Clyde Oliver, a white co-worker, saw the noose and told one of the imports to take the noose down. When the defendant called Oliver as a witness, he denied ever having seen the noose. On rebuttal, Vance called a black co-worker, Roland Ball, who said that Vance had brought him to see the noose, that Oliver had seen it also, and that Ball took it down

and discarded it. Two days later, the plaintiff again found the noose hanging from her light fixture. This time, she removed it herself and threw it in the trash. Neither Vance nor Ball reported the incidents to any Southern Bell official at that time.

Mrs. Vance first mentioned the noose incidents to management on January 9, 1985, over four months later, at a grievance hearing concerning a separate incident. At trial, there was greatly conflicting testimony as to what statements were made at this hearing. Vance mentioned the noose incidents to Nancy Murray, Southern Bell's Personnel Manager, and Murray then asked Bert Sellars, the manager of the Western Way warehouse, whether he knew anything about the noose. Both Vance and Levi McClendon, a black union steward who was present at the hearing, testified at trial that Sellars responded that Paul Wagner had done it "to increase productivity."[1] Notes taken by Nancy Murray at the meeting stated, "In CONECS she found a noose. Paul probably did ..." (R.7–173) However, Sellars denied having made the statement, and Nancy Murray maintained that it was Vance, not Sellars, who mentioned Wagner's name in connection with the noose. At trial, Wagner testified that he had constructed a device which looked like a noose made of hemp rope with a braided loop on one end, but that it had been designed to desheathe cable to increase productivity.

On September 9, 1984, Vance was transferred from the CONECS department to the Repair and Returns department where her first-level supervisor was Walter Stembridge. Vance alleged that during this time, Stembridge and some of Vance's coworkers discriminated against her by purposefully denying her the training necessary to do her job. She testified that Joyce Foskey Blackwood, the "working leader" of the group who was responsible for training Vance, refused to answer Vance's questions as to how to do her job. Vance also claimed that some of her work had been sabotaged by an unknown employee.

---

**1.** The district court found it "obvious that the remark regarding an increase in productivity related to the fact that Mr. Wagner had made the device; *not* that he hung it over the Plaintiff's workbench." *Vance,* 672 F.Supp. at 1410.

Stembridge, however, testified that Vance had received essentially the same training as everyone else. Twice Stembridge brought in outside people to train the entire section. Vance further testified that she wrote a letter to the warehouse manager, Bert Sellars, asking to be transferred, but she was not moved. Sellars admitted that he had heard of Vance's complaints of inadequate training.

On September 18, 1984, Tommy Lee Sampson, a black manager of employment and selections, contacted Vance about an allegation that she had omitted information on an employment questionnaire concerning a traffic violation that had occurred three years earlier. Vance explained that she had misunderstood the form, believing that a traffic ticket did not count as a "conviction" which had to be reported. Although he testified that he was unable to determine whether or not Vance's omission was intentional, Sampson suspended Vance for two days without pay. He eventually reduced the suspension to a warning entry on Vance's record, but she was not reimbursed for the two days' pay. Vance alleged that several other black employees were suspended for similar omissions, but that Clyde Oliver, a white employee, was treated differently because of his race. Oliver received a written warning for failing to report a conviction for stealing gasoline when he was sixteen years old. Sampson explained that he did not suspend Oliver for this omission because the crime had occurred about twenty years earlier.

On October 16, 1984, a grievance hearing was held concerning the discipline Vance received for the traffic ticket omission. At this hearing, Vance became upset and cried. Upon returning to her work station at the Repair and Returns department, Vance had an altercation with Joyce Foskey Blackwood. Once again, there is conflicting testimony as to what was said and done, but it is clear that Vance struck Blackwood during the argument. Bert Sellars and Walt Stembridge suspended both women for one and one-half days without pay. Vance testified that she told Sellars that there was a "black-white situation" between her and Blackwood, and that Sel-

lars responded by saying, "I'm giving you a direct order. Do not repeat that again." (R.7–298–99). Both Blackwood and Vance grieved their suspensions. After investigating the incident, Sellars and Stembridge decided to rescind Blackwood's suspension and give her back pay. Vance's discipline was not rescinded. The defendant maintains that its investigations showed that Vance had struck Blackwood, but that Blackwood had not struck Vance, and that this was the reason for the disparate treatment. Vance testified that the investigation was biased because the investigators relied solely on the account of the incident given by Norma Brown, a good friend of Blackwood, who told the investigators that Vance had been at fault. Brown was the only eyewitness to the altercation. Vance told the investigators that Blackwood had struck her first, and claims that the investigators discounted her story, despite the fact that Brown's credibility should have been suspect because there had been bad blood between Vance and the two women.

On November 15, 1984, Vance suffered an anxiety attack shortly following an incident in which Vance claimed that someone had sabotaged a pay phone which she was repairing. She testified that her body went numb from the waist down and she collapsed in the ladies room. Thereafter, Stembridge, a co-worker Mary Smith, and a paramedic entered the ladies room to assist her. Vance said that Smith had spoken to Vance's doctor, Dr. Rosin, who told Smith to have Vance brought to the emergency room at Baptist Hospital as soon as possible. Vance claims that Smith had relayed this information to her while Stembridge was with them in the restroom. Stembridge drove Smith and Vance to Memorial Hospital instead, which Vance claims was an act of racial harassment. Vance testified that she asked Stembridge several times in the car to take her to Baptist, but that Stembridge intentionally ignored her. Stembridge denied having heard Vance or anyone else ask him to go to Baptist instead of Memorial, and claimed that he took Vance to Memorial because he believed it was the facility that the company

normally utilized for emergency treatment of employees.

About a week before this anxiety attack, Dr. Rosin wrote a letter to Southern Bell concerning the "undue pressure and harassment on her job" which she had told him she was suffering. The plaintiff argued that Stembridge brought her to the wrong hospital, to avoid seeing Dr. Rosin and verifying his concerns. The district court ruled that this was an unreasonable inference, since it was not clear that Stembridge had ever seen the letter from Dr. Rosin.

After the anxiety attack, Vance was out on sick leave, with full pay, from November 15, 1984 until January 10, 1985. On January 9, 1985, Vance returned to the warehouse and attended the grievance hearing concerning her discipline stemming from the incident with Joyce Foskey Blackwood. It was at this meeting that Vance first mentioned the noose incidents to Southern Bell management. On behalf of Vance, the union requested that her suspension be rescinded as Blackwood's had been, but Southern Bell denied this request because of its determination that Vance had thrown the first and only blow during the altercation. Southern Bell offered to reduce Vance's suspension to one-half day if Vance would drop a complaint she had brought against the company with the Jacksonville EEOC ("JEOC"). Vance's union representative was willing to accept the proposal, but Vance refused. Her discipline remained as initially given.

The plaintiff claims that Southern Bell's proposed settlement offer amounted to racial discrimination, in that she was asked to drop her JEOC complaint which was unrelated to the grievance hearing, and which itself included a charge of racial discrimination. At trial, Nancy Murray, the company's staff manager of labor relations, testified that such settlement offers are routine, regardless of the substance of the JEOC complaint and the race of the party involved.

Vance also alleges that Southern Bell's refusals to grant her requests for transfer to a different department at Western Way, and later for transfer to a different Southern Bell facility, were motivated by racial discrimination. After her anxiety attack, Vance began seeing Dr. Ruffett, a clinical psychologist, and Dr. Stamm, a psychiatrist. On November 19, 1984, Dr. Ruffett wrote a letter to Southern Bell stating that Vance should be assigned to a new department upon her return to work because of the stress she was experiencing on the job. The union stated this position to Southern Bell at the January 9, 1985 grievance hearing, but Nancy Murray informed Vance that the request had been denied. On March 14, 1985, Vance was transferred to the PICS department, and on July 26, 1985 she was transferred again to the Preterm department.

Thereafter, Vance submitted a number of letters to Southern Bell from Dr. Ruffett recommending that she be transferred to a position outside the Western Way facility for health reasons. On October 8, 1985, Vance delivered to Sellars an Employee Request for Lateral Inter–Company Movement, with a letter from Dr. Ruffett attached. Some days later, Vance stopped working at Western Way. She testified that this was in accordance with Dr. Ruffet's instructions.

Vance was contacted by the company in March 1986 about a position as an operator outside of the Western Way facility. Although she had previously performed this job, she was required to take a test, which she failed. In March 1987, she was offered a position as a clerk at Western Way, but she turned it down. Vance alleges that she never received any other offers to return to work, although many positions throughout Jacksonville were available. Vance brought this action on March 27, 1986, under 42 U.S.C. §§ 1981, 1985(3) and 1986 (1982). On April 6, 1987, before commencement of the trial, Vance dropped her claims against the originally named individual defendants. At the close of the plaintiff's case, she moved to dismiss the counts alleging violations under 42 U.S.C. §§ 1985(3) and 1986. The jury trial proceeded against Southern Bell solely on the

basis of § 1981.[2] The jury returned a verdict for the plaintiff awarding $42,000 for past lost wages and benefits, $500,000 for future lost wages, $500,000 for mental distress, emotional harm or humiliation, $3,700 for medical expenses, and $2.5 million in punitive damages.

## II. Standard of Review

In considering a motion for JNOV, the court should view all of the evidence, together with all logical inferences flowing from the evidence, in the light most favorable to the non-moving party:

> If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of motions is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury....

*Neff v. Kehoe*, 708 F.2d 639, 641–42 (11th Cir.1983) (quoting *Boeing Co. v. Shipman*, 411 F.2d 365, 374–75 (5th Cir.1969)).

The plaintiff in a racial discrimination case can establish a violation of Title VII or § 1981 by showing that the work environment is "so heavily polluted with discrimination as to destroy completely the emotional and psychological stability of minority group workers...." *Vaughn v. Pool Offshore Co.*, 683 F.2d 922, 924 (5th Cir. 1982) (quoting *Rogers v. EEOC*, 454 F.2d 234, 238 (5th Cir.1971), *cert. denied*, 406 U.S. 957, 92 S.Ct. 2058, 32 L.Ed.2d 343 (1972)).[3] The plaintiff must prove that the discrimination is intentional. *See Baldwin v. Birmingham Bd. of Educ.*, 648 F.2d 950, 954 (5th Cir. Unit B March 1981).

The Supreme Court established the framework for analyzing discrimination claims under § 1981 in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *Smith v. Papp Clinic, P.A.*, 808 F.2d 1449 (11th Cir.1987). The plaintiff has the initial burden to present a prima facie case of racial discrimination. The burden of production then shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the alleged discriminatory behavior. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 258, 101 S.Ct. 1089, 1096, 67 L.Ed.2d 207 (1981). Should the defendant produce a legitimate reason, the plaintiff must then prove by a preponderance of the evidence that the presumptively valid reason offered by the defendant was not the true reason, but rather was merely a pretext for discrimination. *McDonnell Douglas*, 411 U.S. at 804–05, 93 S.Ct. at 1825.

---

**2.** 42 U.S.C. § 1981 (1982) provides:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

**3.** We reject the defendant's contention that the district court's order for JNOV must be affirmed because racial harassment claims are not covered by § 1981. Appellee's reliance on *Patterson v. McLean Credit Union*, 805 F.2d 1143 (4th Cir.1986), *cert. granted*, —— U.S. ——, 108 S.Ct. 65, 98 L.Ed.2d 29 (1987) is misplaced. In *Patterson*, the court contrasted the language of Title VII, which prohibits discrimination with respect to the "terms, conditions or privileges of employment" with § 1981's prohibition of discrimination in "the making and enforcement of contracts." We need not reach the issue of whether § 1981 covers "pure" harassment claims, because Vance presented evidence that the harassment caused her to stop working at Western Way, thereby impairing her ability to make and enforce her employment contract.

Furthermore, we have held that the legal elements of a disparate treatment claim are identical under Title VII and § 1981. *Lincoln v. Board of Regents of Univ. Sys.*, 697 F.2d 928, 935 n. 6 (11th Cir.), *cert. denied*, 464 U.S. 826, 104 S.Ct. 97, 78 L.Ed.2d 102 (1983); *see also Hamilton v. Rodgers*, 791 F.2d 439, 442 (5th Cir.1986) (Showing a discriminatory and hostile work environment would establish a successful case under §§ 1981 and 1983. "[W]hen these statutes are used as parallel causes of action with Title VII, they require the same proof to show liability.").

### III. *Sufficiency of the Evidence*

The first case which recognized a cause of action based upon a discriminatory work environment was *Rogers v. EEOC*, 454 F.2d 234 (5th Cir.1971), *cert. denied*, 406 U.S. 957, 92 S.Ct. 2058, 32 L.Ed.2d 343 (1972). In that case the court held that a Hispanic employee could establish a violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, by showing that her employer created "a working environment heavily charged with ethnic or racial discrimination." *Id.* at 238. The court determined that an individual's state of psychological well-being is a term, condition, or privilege of employment within the meaning of Title VII. Since *Rogers*, several courts have adopted this position, finding that an employer violates Title VII "by creating or condoning an environment at the workplace which significantly and adversely affects an employee because of his race or ethnicity, regardless of any other tangible job detriment to the protected employee." *Henson v. City of Dundee*, 682 F.2d 897, 901 (11th Cir.1982); *Sparks v. Pilot Freight Carriers, Inc.*, 830 F.2d 1554, 1561 (11th Cir.1987).

In *Henson*, this court applied the *Rogers* interpretation of Title VII in a sexual harassment case. However, we made it clear in *Henson* that not all workplace conduct that may be described as harassment affects a "term, condition, or privilege" of employment within the meaning of Title VII:

> [The harassment] must be sufficiently pervasive so as to alter the conditions of employment and create an abusive working environment. Whether sexual harassment at the workplace is sufficiently severe and persistent to affect seriously the psychological well being of employees is a question to be determined with regard to the totality of the circumstances.

*Henson*, 682 F.2d at 904. *See also Meritor Savings Bank v. Vinson*, 477 U.S. 57, 66–67, 106 S.Ct. 2399, 2405–06, 91 L.Ed.2d 49 (1986) (citing *Henson* with approval).

In the order granting JNOV in this case, the district court ruled that the evidence concerning the noose incidents, viewed in the light most favorable to the plaintiff, established that a noose was hung over Vance's work station on two occasions, but that the plaintiff had presented no evidence as to who hung the noose on either occasion. Regarding each of the other alleged incidents of discrimination, the trial court ruled that the plaintiff either failed to make out a prima facie case, or that the defendant provided a legitimate, nondiscriminatory reason for its conduct which the plaintiff failed to rebut. Thus, the court granted the motion for JNOV, stating that "[t]wo incidents are not enough to establish that the alleged harassment was a persistent, pervasive practice." *Vance*, 672 F.Supp. at 1413.

We believe that the trial court incorrectly applied the "pervasiveness" standard outlined in *Henson* and *Meritor*. Those cases held that an actionable harassment claim must establish by the totality of the circumstances, the existence of a hostile or abusive working *environment* which is severe enough to affect the psychological stability of a minority employee. The prima facie showing in a hostile environment case is likely to consist of evidence of many or very few acts or statements by the defendant which, taken together, constitute harassment. It is important to recognize that in assessing the credibility and weight of the evidence presented, the jury does not necessarily examine each alleged incident of harassment in a vacuum. What may appear to be a legitimate justification for a single incident of alleged harassment may look pretextual when viewed in the context of several other related incidents.

■ We stress also that the determination of whether the defendant's conduct is sufficiently "severe and pervasive" to constitute racial harassment does not turn solely on the number of incidents alleged by the plaintiff. In a recent hostile environment harassment case, the Sixth Circuit explained that drawing a formal line between "isolated incidents" and a "pattern of harassment" is not helpful to the analysis:

[T]he plaintiff need not prove that the instances of alleged harassment were related in either time or type. Rather, all that the victim of racial harassment need show is that the alleged conduct constituted an unreasonably abusive or offensive work-related environment or adversely affected the reasonable employee's ability to do his or her job.

*Davis v. Monsanto Chemical Co.*, 858 F.2d 345 (6th Cir.1988). Thus, in order to determine whether a hostile environment is severe enough to adversely affect a reasonable employee, the law requires that the finder of fact examine not only the frequency of the incidents, but the gravity of the incidents as well.

■ By contrast, the district court in the present case used a two-step analysis to determine whether the plaintiff's evidence was sufficient to withstand the defendant's motion for JNOV. First, the district court examined each individual allegation of discrimination in turn, and found that the plaintiff had made out a prima facie case of discrimination only as to the two noose incidents. Next, the court held that two incidents of discrimination are too few, as a matter of law, to establish a harassment claim under § 1981.

Both prongs of the analysis are incorrect. First, as we stated in *Henson*, the severity of the harassment is to be determined by the totality of the circumstances. *Henson*, 682 F.2d at 904. It was thus incorrect for the district court to require that the plaintiff establish a prima facie case of discrimination as to each individual allegation that the jury could properly consider. A hostile environment claim is a single cause of action rather than a sum total of a number of mutually distinct causes of action to be judged each on its own merits. Second, the totality of the circumstances necessarily includes the se-

verity,[4] as well as the number, of incidents of harassment. It is thus incorrect to apply mechanically an absolute numerical standard to the number of acts of harassment which must be committed by the defendant before a jury may reasonably find that a hostile environment exists.

■ We find that the trial court erred in ruling that no reasonable jury could have found that the plaintiff was the victim of racial harassment within the scope of § 1981. As the district court noted, the plaintiff produced substantial evidence that a noose was twice hung at her work station. The jury could also have found that Vance was discriminated against with respect to the discipline she received for failing to mention the traffic ticket on her transfer application, and for the altercation with her co-worker Joyce Foskey Blackwood. Regarding the incident involving Vance's transportation to the wrong hospital by her supervisor, Mr. Stembridge, the court found that it was "inconclusive" as to whether he had heard Vance's request to be brought to Baptist Hospital, and that even if he did, he offered a legitimate explanation for his action. Whether Stembridge actually heard Vance's request, and if he did, whether his explanation for not honoring her request was legitimate or pretextual, are both questions for the trier of fact. *Burdine*, 450 U.S. at 258, 101 S.Ct. at 1096. The plaintiff also produced evidence of instances of discrimination involving other employees at the Western Way facility, both before and during her tenure there.[5] Viewing all the evidence in context, we believe that the plaintiff satisfied her burden of producing evidence sufficient to create a jury question on her § 1981 claim.

## IV. *Corporate Liability*

As additional grounds for granting JNOV, the district court found that South-

---

**4.** It is hard to imagine an incident of this sort taking place in 1984. The grossness of hanging an object resembling a noose at the work station of a black female is self-evident.

**5.** The discriminatory intent element can be proven "by direct or circumstantial evidence. The trier of fact should consider all the evidence...." *United States Postal Serv. Bd. of*

*Governors v. Aikens*, 460 U.S. 711, 714 n. 3, 103 S.Ct. 1478, 1481 n. 3, 75 L.Ed.2d 403 (1983). Thus, the jury properly could have considered evidence of discriminatory acts at the Western Way facility directed at employees other than the plaintiff, as tending to show the existence of racial animus in the present case.

ern Bell could not be liable to Vance for damages even assuming that the alleged harassment constituted a violation of § 1981. The court held that because the evidence clearly showed that Vance failed to report the noose incidents to any "management personnel" despite the existence of adequate procedures for reporting grievances, Southern Bell could not be liable as a matter of law. We disagree.

■ Assuming that the plaintiff is able to show harassment sufficient to sustain a claim under Title VII or § 1981, there are two theories under which a corporate defendant can be held liable for hostile environment harassment at the workplace. First, where the hostile environment is created by one who is not the plaintiff's employer (i.e., a co-worker) the employer may be held liable through *respondeat superior* if the plaintiff can establish that the employer knew or should have known of the harassment and failed to take remedial action. *Henson*, 682 F.2d at 910.[6] The plaintiff can prove that the employer knew of the harassment by showing either that she complained to higher management or that the harassment was pervasive enough to charge the employer with constructive knowledge.

Second, where the harasser is himself the plaintiff's employer, or an agent of the employer, the employer is directly, rather than indirectly liable for the harassment. *Sparks*, 830 F.2d at 1558. Under this scenario *"respondeat superior* theory does not apply and plaintiff need not establish that she gave anyone notice of the harassment." *Id.; Horn v. Duke Homes, Div. of Windsor Mobile Homes, Inc.*, 755 F.2d 599, 604 (7th Cir.1985). Thus, a jury could properly hold the company liable for damages under § 1981 by finding that the illegal acts were committed by someone deemed to be the plaintiff's employer. In such a case, "[w]hether *his* superiors know or should have known what he did is irrelevant...." *Hunter v. Allis–Chalmers*

*Corp., Engine Div.*, 797 F.2d 1417, 1422 (7th Cir.1986) (emphasis in original).

In order for this court to uphold the district court's ruling that the plaintiff failed to prove Southern Bell's liability for the acts committed by Wagner and others, the evidence must show that no reasonable jury could have found Southern Bell liable under *either* of the two theories outlined above. We must therefore determine whether the evidence in this case is sufficient to create a jury question under either the theory of *respondeat superior*, or direct liability through an agent of Southern Bell.

### A. Respondeat Superior

In its order granting JNOV, the district court ruled that even if the plaintiff had proved a violation of § 1981, Southern Bell could not be held liable for damages for hostile environment harassment. The court gave two reasons. First, assuming that the jury could have accepted the plaintiff's inference that Wagner hung the noose over her work station, she "failed to introduce any evidence that the Company knew of this," and thus it could not be liable under *Henson. Vance*, 672 F.Supp. at 1413. However, as previously noted, this court has held that an employer may be liable for the discriminatory acts of a non-management employee if "the harassment was so pervasive that an inference of constructive knowledge arises." *Huddleston v. Roger Dean Chevrolet, Inc.*, 845 F.2d 900, 904 (11th Cir.1988); *Henson*, 682 F.2d at 910.

■ We believe that given all the evidence, a reasonable jury could have found that higher management should have known that the plaintiff was subjected to racial harassment. The jury must be permitted to consider all the evidence before it when making the factual determination of whether higher management should have been aware of the alleged harassment. By examining only the noose incidents, and finding that it was unreasonable for the

---

6. In *Henson*, we assumed that the supervisor alleged to have created the hostile environment was not the plaintiff's employer. *Id.* at 905 n. 9.

jury to charge the company with constructive knowledge of them, the district court failed to consider that the jury may properly have based a finding regarding the company's constructive knowledge on evidence other than that concerning the nooses. Just as the determination of whether conduct is sufficiently "severe and pervasive" to constitute actionable harassment requires evaluation of the totality of the circumstances, the factfinder here must examine the evidence in the same manner. Again the egregiousness, as well as the number of the incidents, is plainly relevant.

■ Second, the district court held that the failure of the plaintiff to give the company timely notice and the provision by Southern Bell of adequate grievance procedures insulated the company from liability.[7] However, we conclude that in this case, the question was more properly one for the trier of fact. In *Meritor*, a sexual harassment case, the Supreme Court addressed the defendant's argument that its grievance procedures, along with the plaintiff's failure to provide the company with notice, protected the defendant from liability. The Court held first, that "absence of notice to an employer does not necessarily insulate that employer from liability." *Meritor*, 477 U.S. at 72, 106 S.Ct. at 2408. Next, the Court ruled that the availability of avenues for redress of an employee's grievances does not necessarily leave the employer free of liability:

> [W]e reject petitioner's view that the mere existence of a grievance procedure and a policy against discrimination, coupled with respondent's failure to invoke that procedure, must insulate petitioner from liability. While those facts are plainly relevant, the situation before us demonstrates why they are not necessarily dispositive. Petitioner's general non-discrimination policy did not address sex-

ual harassment in particular, and thus did not alert employees to their employer's interest in correcting that form of discrimination. App. 25. Moreover, the bank's grievance procedure apparently required an employee to complain first to her supervisor, in this case Taylor. Since Taylor was the alleged perpetrator, it is not altogether surprising that respondent failed to invoke the procedure and report her grievance to him. Petitioner's contention that respondent's failure should insulate it from liability might be substantially stronger if its procedures were better calculated to encourage victims of harassment to come forward.

*Id.* at 72–73, 106 S.Ct. at 2408–09.

In several respects, the facts concerning notice and grievance procedures in this case are similar to those in *Meritor*. Vance testified that she did not report the noose incident because she was scared. Referring to the first noose incident, Vance testified:

> I didn't know who had [hung the noose]. I didn't know anyone in that warehouse. I may have been talking to the person actually that did this thing. So that is why I didn't say anything. (R.7–283).

When asked to explain why she did not bring the noose to the attention of Wagner or Sellars after the second time it was hung at her workbench, the plaintiff testified:

> I felt that something was terribly wrong at Western Way. I didn't know Mr. Sellars, I didn't know Mr. Wagner. But for something like this to be allowed, someone had to know something, but I was too afraid to ask. (R.7–286).

We believe that a jury reasonably could have found that the plaintiff's testimony was credible, and that Southern Bell's grievance procedures did not rise to the

---

7. The district court stated:
 Plaintiff testified that she did not immediately report the incident to any other supervisor even though other supervisors were available, and additionally, other supervisors were black. Defendant's procedures for reporting a grievance were adequate to encourage alleged victims of harassment to come forward, even if the alleged harassment was perpetrated by a direct supervisor. Plaintiff's failure to report the incident to any management personnel insulated the Company from liability in this case. *See Meritor*, 106 S.Ct. at 2409. Plaintiff's silence prevented the Company from taking reasonable steps to prevent future harassment.... *Vance*, 672 F.Supp. at 1413.

level necessary to insulate the company from liability under *Meritor.*[8] Thus we find that the district court erred in ruling that Southern Bell's grievance procedures insulated the company from liability as a matter of law.

### B. Direct Liability

In *Meritor,* the Supreme Court addressed the issue of when a corporate defendant will be liable under Title VII for the acts of specific employees. The Court declined to issue a definitive rule, but held that courts should look to common law agency principles for guidance in this area. *Id.* at 72, 106 S.Ct. at 2408. We have held that where a plaintiff's alleged harasser acts as an agent of the employer, the harasser is the employer for purposes of Title VII. *Huddleston,* 845 F.2d at 904; *Sparks,* 830 F.2d at 1557–59.[9] "This liability is direct; the employer cannot find shelter in the claim that it neither had notice of, or approved of, the unlawful conduct." *Sparks,* 830 F.2d at 1559; 29 C.F.R. § 1606.8(c) (1988).

In *Sparks* we reversed a grant of summary judgment for the defendant in a sexual harassment action brought against the plaintiff's employer under Title VII. The district court had ruled that under *Henson* the plaintiff could not prevail because she had failed to allege that higher management knew or should have known that she

was being harassed by her manager. We ruled that the district court had misconstrued *Henson:*

> In applying the *respondeat superior* requirement of *Henson,* ... the district court overlooked the fact that the *Henson* court's decision to employ *respondeat superior* theory rested on its assumption that the plaintiff's alleged harasser was her supervisor but not her "employer." *Henson,* 682 F.2d at 905, n. 9. Here, in contrast, Sparks alleges that Long was both her supervisor *and* her "employer," as that term is defined under Title VII.

830 F.2d at 1557 (emphasis in original).

Similarly, the plaintiff in this case alleges that Wagner was an agent of the company for direct employer liability purposes. We must therefore ascertain whether the plaintiff produced substantial evidence at trial upon which the jury reasonably could have predicated a finding of direct liability through an agent of the company.[10] Specifically, we must determine whether the individual parties alleged to have committed acts of harassment against the plaintiff could be considered agents of Southern Bell.

Several courts, including ours, have held that in so called "tangible job detriment" harassment cases, a supervisory employee acts as an agent of his employer under

---

**8.** In *Henson,* we rejected the argument that an employer may escape liability for harassment by taking subsequent remedial action. "Such action by the employer may, of course, mitigate damages, but it in no way affects an employer's liability." *Henson,* 682 F.2d at 910 n. 19. In any event, the plaintiff produced substantial evidence that Southern Bell failed to investigate the noose incidents even after they were brought to its attention. Therefore, to the extent that the district court based its order granting JNOV on its conclusion that the "[p]laintiff's silence prevented the Company from taking reasonable steps to prevent future harassment or to remedy past harassment," *Vance,* 672 F.Supp. at 1413, the court erred.

**9.** 42 U.S.C. § 2000e(b) (1982) provides in pertinent part:

(b) The term "employer" means a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar

weeks in the current or preceding calendar year, *and any agent of such a person....* (emphasis added). We find that agency principles are similarly applicable where, as here, the harassment claim is brought under § 1981.

**10.** The district court correctly instructed the jury that the plaintiff could show the defendant's knowledge of the alleged harassment in one of two ways: either that "someone in a position of authority knew or should have known" of the harassment, or "that a supervisor acting within his or her scope of employment with the defendant, as an agent of the defendant, intentionally harassed the plaintiff because of her race...." (R.10–161).

However, in its order granting the defendant's motion for JNOV, the court apparently ignored the possibility that the jury based its verdict on an agency theory, and held that Vance's failure to provide notice to higher management insulated Southern Bell from liability. This constitutes reversible error.

Title VII when that employee uses the authority delegated to him by the employer to harass the plaintiff. In *Sparks,* a tangible job detriment case, we adopted the liability standard proposed by the EEOC in its amicus brief in *Meritor* [11] which would hold an employer directly liable for the actions of a supervisor "where [the] supervisor exercises the authority actually delegated to him by his employer, by making or threatening to make decisions affecting the employment status of his subordinates." *Sparks,* 830 F.2d at 1559 (quoting *Meritor,* 477 U.S. at 70, 106 S.Ct. at 2407).[12] However, in that case, we found that the standard for determining an agency relationship in tangible job detriment cases was not necessarily applicable in other types of harassment cases:

> [W]e need not address the issue raised by the EEOC, and not resolved by the Supreme Court, in *Vinson:* what rule should govern the employer's liability for sexual harassment by its supervisors where the sexual harassment claim rests "exclusively" on a "hostile environment" theory, in that the supervisor neither explicitly nor implicitly threatened to use his authority against the victim.

*Id.* at 1560 n. 9 (citation omitted).

■ We believe that an agency standard which looks solely to the degree of authority the harasser wields over the plaintiff is not particularly useful in a hostile environment case such as this one. As we stated in *Henson,* "[t]he capacity of any person to create a hostile or offensive environment is not necessarily enhanced or diminished by any degree of authority which the employer confers upon that individual." *Henson,* 682 F.2d at 910. While the supervisor's direct authority over the plaintiff must be considered as a relevant factor, we believe that courts should also examine any evidence bearing on the overall structure of the workplace, including the relative positions of the parties involved. We agree

with the EEOC Guidelines, which state that it is necessary to examine

> the circumstances of the particular employment relationship and the job functions performed by the individual in determining whether an individual acts in either a supervisory or agency capacity.

29 C.F.R. § 1606.8(c) (1988).

In *Hamilton v. Rodgers,* 791 F.2d 439 (5th Cir.1986), the court found two supervisors to be agents of the fire department "despite their intermediate standing within the Department's hierarchy," based partly on their "authority over matters such as car assignments and the staffing of shifts...." *Id.* at 442. Similarly, the plaintiff in the present case presented evidence that as her supervisor, Wagner had the authority to suspend employees, place discipline reports in employee personnel files, handle union grievance proceedings, and make personnel changes in his department.

■ Thus we believe that the plaintiff produced evidence from which a reasonable jury could conclude that in creating a hostile work environment, Wagner acted as an agent of Southern Bell under the standard outlined above. The district court therefore erred by ruling otherwise.

### V. *Motion for New Trial*

The district court also ruled that were it not for the fact that the defendant's motion for JNOV is granted, the court would grant the defendant's motion for a new trial. The court found that the verdict was contrary to the great weight of the evidence, and that the relief awarded was grossly excessive so as to shock the conscience of the court. *Vance,* 672 F.Supp. at 1415.

■ In a motion for a new trial, the court is free to weigh the evidence. *King v. Exxon Co., U.S.A.,* 618 F.2d 1111, 1115

---

11. In *Meritor,* the Court stated the position proposed by the EEOC, but declined to rule on it. 477 U.S. at 72, 106 S.Ct. at 2408.

12. *See also Miller v. Bank of America,* 600 F.2d 211, 213 (9th Cir.1979) (company held liable "where the action complained of was that of a supervisor, authorized to hire, fire, discipline or promote, or at least to participate in or recommend such actions, even though what the supervisor is said to have done violates company policy.")

(5th Cir.1980).[13] The court's decision on a motion for a new trial is given great deference and is reversible only for a clear abuse of discretion. *Rabun v. Kimberly–Clark Corp.*, 678 F.2d 1053, 1060 (11th Cir.1982). We believe that the grant of a new trial was within the discretion of the trial court, and we affirm the court's order.

 The jury awarded the plaintiff $42,000.00 in back pay. However, the district court ruled that because Vance received her full salary for thirteen weeks, and half pay for seventeen weeks after she stopped work, she received only $4,262.75 less than she would have earned had she not stopped working. *Vance*, 672 F.Supp. at 1415. Thus we believe that the court's ruling that the award of back pay was grossly excessive was within its discretion.

 The jury also awarded Vance $500,000.00 in front pay, for future lost wages. Front pay is available to a plaintiff who has been wrongfully discharged or forced to stop working, as a means of making her whole. *See Nord v. United States Steel Corp.*, 758 F.2d 1462, 1473–74 (11th Cir.1985). The *plaintiff's* expert testified that reduced to present value, Vance's maximum lost pay over the course of her remaining working life (27 years) would be $390,404.00. Although the plaintiff argues that the loss of future fringe benefits could bring this figure to $500,-000.00, we believe that the trial judge's ruling that this amount is grossly excessive must be affirmed.

 The plaintiff was awarded $500,-000.00 for mental distress, emotional harm or humiliation caused by racial discrimination. Although the plaintiff produced evidence that she did suffer from stress caused by the hostile environment at the workplace, the trial judge correctly noted that there were many other unpleasant factors in her life which almost certainly contributed to her mental distress. *Vance*, 672 F.Supp. at 1416. The court also noted that the plaintiff is presently fully capable of working and leading a normal life.

Thus we believe that the trial judge's ruling that these damages were grossly excessive must also be affirmed.

 Finally, we find that it was within the discretion of the trial judge to rule that the award of $2.5 million in punitive damages was excessive. Even if the jury were properly able to conclude that the defendant acted with reckless or callous indifference in gross disregard of the plaintiff, *Smith v. Wade*, 461 U.S. 30, 56, 103 S.Ct. 1625, 1640, 75 L.Ed.2d 632 (1983), the award is indeed high and rather shocking in view of the totality of the evidence in the case. This award seems to fit a pattern outside the realm of reasonableness in accordance with the instructions given to the jury. We therefore find that the size of each of the damage awards when considered in light of the evidence presented supports the district court's grant of a new trial.

The district court's order is AFFIRMED in part, REVERSED in part, and REMANDED for a new trial.

---

13. For a discussion of the subtle differences between a motion for a JNOV and a new trial see *Bazile v. Bisso Marine Co.*, 606 F.2d 101 (5th Cir.1979).