**Raymond WOODS, Jr.,
Plaintiff–Appellee,**

v.

**GRAPHIC COMMUNICATIONS; Union Local 747/Printing Specialties; Local Union 380, Defendants–Appellants.**

**Nos. 89–35400, 89–35842.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Aug. 8, 1990.

Decided Feb. 20, 1991.

Richard H. Robblee, Hafer, Price, Rinehart & Schwerin, Seattle, Wash., for defendants-appellants.

Jeffrey Needle, Seattle, Wash., for plaintiff-appellee.

Before WRIGHT, BEEZER and TROTT, Circuit Judges.

BEEZER, Circuit Judge:

Graphic Communications Union Local 747 ("the Union") appeals two judgments of the district court holding the Union liable for racial discrimination against Woods and awarding fees. We affirm and remand.

I

Woods, who is Black, worked at the Kent plant of Princeton Packaging, Inc. ("Princeton"), from 1984 to 1988. The workers at the plant are represented by the Union, of which Woods was a member. Woods was also represented by the shop steward, Mike Floyd, and a shop committeeman, Darrel Burnham.

The labor agreement in effect from 1985 to 1988 contained an explicit anti-discrimination clause.[1] Despite this provision, ra-

---

1. Article VII of the collective bargaining agreement provided:

 NON–DISCRIMINATION
 The Employer and Union shall not discriminate against an employee or applicant for employment, in any terms or conditions of employment, including but not limited to payment of wages, hours of work, assignment of jobs, seniority, promotion and upgrading, training, layoff, recall, discipline and discharge because of

cial jokes, cartoons, comments and other forms of hostility directed at almost every conceivable racial and ethnic group, particularly Blacks, were common at the plant. The parties agree that many such incidents occurred in the area where Floyd worked. Floyd and Burnham made many of the offensive remarks.

Woods worked in an area approximately 100 feet from Floyd. He heard about most of the incidents through other employees. Over the course of his employment, however, Woods was subjected to several racial remarks and hostility, such as a karate chop by Burnham, a racial joke by Floyd, and instructions by coworkers to wash his hands in a urinal. At one point, the letters "KKK" appeared on a machine near his area. During this period, Woods sought psychological counseling, which Princeton provided. He took several medical leaves. Woods left the plant in 1988 due to a knee injury.

The Union was well aware of the racial atmosphere in the plant. Woods complained to the Union through Floyd and other officials, and asked Floyd at least three times to file a grievance concerning the plant's racial atmosphere. The Union concedes it never filed a formal grievance. It did file grievances on behalf of Woods on other subjects, including one race-related attendance issue.

The Union states that it took less formal action. Floyd participated in some shop-floor negotiations concerning specific racial complaints. Floyd also participated in discussions with Princeton's personnel department concerning complaints of racism. The Union posted a notice in response to one incident. Nevertheless, the Union rejected the idea that any Union member should be disciplined by Princeton for racial harassment. At the same time, no disciplinary action was taken by the Union against any Union member, either. Needless to say, the incidents continued.

race, color, religion, creed, age, sex, marital status, national origin, physical or mental handicap or veteran status. *Agreement Between Princeton Packaging, Inc., and Seattle/Kent*

Woods brought this action against Princeton and the Union alleging violations of federal and state law. The federal claims were brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII"); 42 U.S.C. § 1981; and the duty of fair representation under the National Labor Relations Act ("NLRA"). The state law claims were brought for violation of the Washington State Law Against Discrimination, Wash.Rev.Code Ch. 49.60; and the torts of outrage and intentional infliction of emotional distress. Princeton settled the claims against it and was dismissed from the suit. Because the Union was named as a party after the commencement of the suit, the Title VII claims against it were barred by the procedural limitations of that statute. The Union proceeded to trial before the district court on Woods' claims under Wash.Rev. Code Ch. 49.60, 42 U.S.C. § 1981, the NLRA, and state tort law.

The district court found that the incidents of racial harassment had occurred and found Floyd's testimony denying his involvement not credible. Instead, the court found that Floyd and Burnham participated in the harassment of Woods and others. The district court also found that Woods, as well as other employees, had requested the Union to file a grievance about the situation, giving the Union actual and constructive knowledge of racial harassment in the plant. The court found that the Union systematically failed to file a formal grievance or take any effective action to alleviate the problem. The court further found that this failure to act was intentional.

On these facts, the court held that the Union had violated Wash.Rev.Code Ch. 49.-60, § 1981, the duty of fair representation, and state tort law. It awarded general, special, and punitive damages to Woods. It also awarded attorneys' fees and costs, which were reduced on a motion for reconsideration. The Union appeals both judgments.

*Graphic Communication Union Local 747–M,* March 1, 1985—June 30, 1988, at 11 (Clerk's Record 132, Exhibit E–6).

The district court had jurisdiction over the 42 U.S.C. § 1981 claim under 28 U.S.C. § 1343(a)(4) and the NLRA claim under 28 U.S.C. § 1331. It had pendent jurisdiction over the claims brought under Washington state law. *Courtney v. Canyon Television & Appliance Rental, Inc.*, 899 F.2d 845, 848 (9th Cir.1990) (citing *United Mine Workers v. Gibbs*, 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966)). We have jurisdiction over these timely appeals under 28 U.S.C. § 1291.

We review de novo the district court's interpretation of state law. *In re McLinn*, 739 F.2d 1395, 1397 (9th Cir.1984) (en banc). Whether proven incidents constitute violations of § 1981 or the NLRA is a mixed question of law and fact also reviewed de novo. *Galindo v. Stoody*, 793 F.2d 1502, 1513 (9th Cir.1986); *United States v. McConney*, 728 F.2d 1195, 1201 (9th Cir.) (en banc), *cert. denied*, 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984). We "must accept the district court's findings of fact unless they are clearly erroneous." *Vasconcelos v. Meese*, 907 F.2d 111, 112 (9th Cir.1990).

## II

Under the "clearly erroneous" standard, a district court's findings of fact may not be reversed unless we have the "definite and firm conviction" that a mistake has been made. *Vasconcelos*, 907 F.2d at 112. At oral argument, the Union conceded that it does not challenge the district court's findings. The Union admits that the racial atmosphere in the plant was "abysmal."

Intent is also a question of "historical fact that Fed.R.Civ.P. 52(a) enjoins appellate courts to accept unless clearly erroneous." *Goodman v. Lukens Steel Co.*, 482 U.S. 656, 665, 107 S.Ct. 2617, 2623, 96 L.Ed.2d 572 (1987). In its brief, the Union argues there is no evidence that the Union intentionally discriminated against Woods. We disagree. The Union does not deny that racist remarks were made to Woods by Floyd. It knew about the situation in the plant, yet took a conscious stand opposing disciplinary action against Union members for racial harassment. At a minimum, these facts support the district court's finding of discriminatory motive. We are not left with the "definite and firm conviction" that a mistake has been made. The district court's finding of intent was not clearly erroneous.

## III

We next must determine whether the facts support a finding of liability for racial discrimination under state and federal law. We conclude that they do.

### A

The Washington State Law Against Discrimination is codified at Wash.Rev.Code § 49.60.010 *et seq.* Section 49.60.030 guarantees the right to be free from discrimination because of race, including the right "to obtain and hold employment without discrimination." Wash.Rev.Code § 49.60.030(1)(a). Specifically, a union may not "discriminate against any member ... to whom a duty of representation is owed." Wash.Rev.Code § 49.60.190. The entire statute is to be liberally construed. Wash. Rev.Code § 49.60.020.[2]

Washington courts have not yet been called upon to determine the scope of union liability under the statute. However, the modern version of the statute is patterned after Title VII. *Oliver v. Pacific Northwest Bell*, 106 Wash.2d 675, 724 P.2d 1003, 1005 (1986) (en banc). Washington courts will look to federal law for guidance, though they are not bound by that law. *Id.* 106 Wash.2d 675, 724 P.2d at 1005; *Glasgow v. Georgia–Pacific Corp.*, 103

---

**2.** The Washington statute represents a long-standing commitment by the state legislature against discrimination. The statute was enacted in its original form in 1949 and thus predates Title VII. *Reese v. Sears, Roebuck & Co.*, 107 Wash.2d 563, 569, 731 P.2d 497, 501 (1987) (en banc). It is designed to remedy "dignitary torts." *Id.* Actions brought under the statute are "*preventive* in nature." *Glasgow v. Georgia–Pacific Corp.*, 103 Wash.2d 401, 408, 693 P.2d 708, 712 (1985) (emphasis in original). The statute contains a strong statement of legislative policy. *Holland v. Boeing Co.*, 90 Wash.2d 384, 388, 583 P.2d 621, 623 (1978) (en banc).

Wash.2d 401, 406 n. 2, 693 P.2d 708, 711–12 n. 2. (1985).

Under Title VII, a union may be liable in several ways for workplace discrimination. First, a union may be liable under Title VII for intentionally failing to file grievances concerning a racially hostile working environment. *Goodman*, 482 U.S. at 667, 107 S.Ct. at 2624. This inquiry does not require proving that the workplace was hostile. In *Goodman*, as here, the union had for several years been a party to a collective bargaining agreement with a provision expressly prohibiting discrimination. It was aware of, but nevertheless ignored, grievances based on racial harassment and other forms of discrimination. The Supreme Court held that the union's deliberate failure to bring race-based claims, by itself, constituted discrimination, violating the plain terms of Title VII. *Id.* at 667–68, 107 S.Ct. at 2624–25. The union's proffered explanation, that such grievances would upset its relationship with management, was irrelevant. *Id.* at 668, 107 S.Ct. at 2624. So was the fact that the union may have had no racial animus of its own. *Id.*

The Washington statute also prohibits discrimination by a union. As in *Goodman*, the Union admits that it was requested to but never filed a formal grievance alleging racial harassment. Its proffered explanation is that Woods' complaints were too "general." The Union suggests that only specific incidents, and not the overall tone of the workplace, would have been worthy of a grievance.

██ We reject this argument. Courts have long recognized that a workplace in which racial hostility is pervasive constitutes a form of discrimination. *See Rogers v. EEOC*, 454 F.2d 234, 238 (5th Cir.1971), *cert. denied*, 406 U.S. 957, 92 S.Ct. 2058, 32 L.Ed.2d 343 (1972). Washington courts have adopted this standard. *See Fisher v. Tacoma School Dist. No. 10*, 53 Wash.App.

591, 595–96, 769 P.2d 318, 320 (racial harassment), *review denied*, 112 Wash.2d 1027 (1989); *Glasgow*, 103 Wash.2d at 406, 693 P.2d at 712 (sexual harassment). Woods complained more than once of exactly this phenomenon yet the Union chose not to file a grievance. This brings the case squarely within the rule of *Goodman*. We affirm the district court's holding that the Union violated Wash.Rev.Code. § 49.60.190.

██ A union may also be liable under Title VII for acquiescing in a racially discriminatory work environment.[3] In *Bonilla v. Oakland Scavenger Co.*, we stated:

> Title VII and Section 1981 prohibit discrimination by unions to the same extent they prohibit discrimination by employers. The union has an affirmative obligation to oppose employment discrimination against its members. If instead it acquiesced or joined in the Company's discrimination practices, it too is liable to the injured employees.

697 F.2d 1297, 1304 (9th Cir.1982) (citing *McDonald v. Santa Fe Transp. Co.*, 427 U.S. 273, 284–85, 96 S.Ct. 2574, 2580–81, 49 L.Ed.2d 493 (1976); *Kaplan v. International Alliance of Theatrical and Stage Employees and Motion Picture Operators*, 525 F.2d 1354, 1360 (9th Cir.1975); *Macklin v. Spector Freight Systems, Inc.*, 478 F.2d 979, 989 (D.C.Cir.1973)), *cert. denied*, 467 U.S. 1251, 104 S.Ct. 3533, 82 L.Ed.2d 838 (1984). For example, in *Macklin*, the District of Columbia Circuit held that a union may be separately liable under Title VII for its participation in the discriminatory hiring practices of an employer. *Macklin*, 478 F.2d at 989.

*Macklin* and *Bonilla* were, in turn, relied upon by the Third Circuit in its decision in *Goodman v. Lukens Steel Co.*, 777 F.2d 113, 126 (3d Cir.1985), *aff'd*, 482 U.S. 656, 107 S.Ct. 2617, 96 L.Ed.2d 572 (1987). There the court reviewed the origins and rationale of the affirmative duty to combat

---

**3.** Wash.Rev.Code § 49.60.220 also prohibits "aiding and abetting" discrimination. However, a violation of this provision requires more than mere knowledge that discrimination has occurred. To violate the statute, a party must participate in a discriminatory activity for the *purpose* of discriminating. *Rody v. Hollis*, 81 Wash.2d 88, 94, 500 P.2d 97, 101 (1972) (en banc).

discrimination in the workplace. *Id.* It did not rely on this duty to find liability, however, because the acts of the union constituted more than mere passivity.

In affirming, the Supreme Court took a similar course. It noted, but did not rely on the duty. It preferred to rest its holding on the union's deliberate choice not to process grievances, since the evidence proved "'far more' than mere passivity." *Goodman,* 482 U.S. at 666–67, 107 S.Ct. at 2623–24.

Courts following *Goodman* have continued to recognize that an affirmative duty may exist. *See Wilson v. Myers,* 823 F.2d 253, 257 (8th Cir.1987) (recognizing potential cause of action if union endorsed discrimination). But, as in *Goodman,* we need not rest our ruling on this ground. The Union's acts constituted "more than mere passivity," violating Wash.Rev.Code § 49.60.190.

Finally, Wash.Rev.Code § 49.60.190 prohibits *any* discrimination by a union against a member. This necessarily includes overt acts of discrimination by union officials.

Racial harassment is a form of discrimination usually charged against an employer because the claim is grounded in the fact that the offensive conduct alters the "terms and conditions of employment." Ordinarily, this is an employer's responsibility.[4] *See Fisher,* 53 Wash.App. at 595; 769 P.2d at 320; *Glasgow,* 103 Wash.2d at 407, 693 P.2d at 712. Here, however, the Union also assumed responsibility for preventing discrimination in terms and conditions of employment.[5] "The same reasons which prohibit an employer from discriminating on the basis of race ... apply equally to the union." *McDonald,* 427 U.S. at 285, 96 S.Ct. at 2581. We see no reason why a union should not be equally liable for its acts of racial harassment against its own members. *See Wilson,* 823 F.2d at

257 (distribution of offensive pamphlets by union official).

The Union presents two arguments against finding it liable for racial harassment by Floyd and Burnham. First, it argues that the incidents that occurred did not constitute harassment of Woods. Second, it argues that Floyd and Burnham were not the Union's agents because they were acting outside the scope of their authority when they performed the acts of harassment. We reject both arguments in turn.

The Union argues first that the "handful" of incidents directed at Woods were not sufficiently severe to create a hostile environment. It suggests that a reasonable person in Woods' position would not have been offended. Under Washington law, however, the conduct must be regarded as offensive by the *employee. Glasgow,* 103 Wash.2d at 406, 693 P.2d at 712.[6] Woods made it clear that he regarded the incidents as offensive.

The conduct must also be sufficiently severe and pervasive to alter working conditions. *Id.* This is a question of law we review de novo. *EEOC v. Hacienda Hotel,* 881 F.2d 1504, 1514 (9th Cir.1989). In making this determination, Washington courts look to the "totality of the circumstances." *Glasgow,* 103 Wash.2d at 406–07, 693 P.2d at 712. The Union invokes, but fails to recognize the implications of, this principle. While an isolated incident is not enough, *id.,* the number of incidents alone is not determinative. In *Vance v. Southern Bell Telephone & Telegraph Co.,* 863 F.2d 1503 (11th Cir.1989), a noose was twice hung over the work area of a black woman employee. The Eleventh Circuit emphatically held that the severity of such incidents could offset the lack of frequency. *Id.* at 1510–11. Conversely, incidents that are much less severe may constitute harassment in the context of a working atmo-

---

**4.** An *employer* may not discriminate in "terms or conditions of employment" because of race. Wash.Rev.Code § 49.60.180.

**5.** *See* Agreement, *supra,* note 1.

**6.** Intent to "harass" is not required because the relevant viewpoint is that of the victim. *Glasgow,* 103 Wash.2d at 406, 693 P.2d at 712. *See King v. Board of Regents of Univ. of Wisconsin System,* 898 F.2d 533, 537 (7th Cir.1990).

sphere "polluted" with racial tension. *Rogers,* 454 F.2d at 238.

Here, the atmosphere of the plant was unquestionably polluted. Woods was surrounded by racial hostility, and subjected directly to some of it. Even though he worked in a different area, Woods had to deal with Floyd, since his complaints had to be lodged through him.

Under Title VII, an employee has a "right to work in an environment free from discriminatory intimidation, ridicule, and insult." *Meritor Savings Bank v. Vinson,* 477 U.S. 57, 65, 106 S.Ct. 2399, 2405, 91 L.Ed.2d 49 (1986). Floyd and Burnham contributed generously to creating such a prohibited environment for Woods. Even if only a few of their acts were directed at Woods personally, they were far from isolated incidents. We hold that the environment was sufficiently hostile that their acts constituted harassment.

The Union next argues that it should not be responsible for the racially offensive acts of its steward, Floyd, and committeeman, Burnham, because they were acting outside the scope of their agency. *See* Restatement (Second) Agency § 219–237 (1958). The Union suggests that only acts committed in the course of grievance processing could give rise to Union liability.

Again we disagree. An employer may be liable for the acts of a supervisor when it knew or should have known he was engaging in harassment. *Meritor,* 477 U.S. at 72, 106 S.Ct. at 2408. This standard has been adopted by the Washington courts, *Fisher,* 53 Wash.App. at 596, 769 P.2d at 320, and in our decisions. *Hacienda,* 881 F.2d at 1515. Lack of notice does not insulate the employer from liability, especially when, as in *Meritor* and here, the harassing employee was also the official through whom a complaint would otherwise have been lodged.[7] If no complaint has been lodged, constructive knowledge may be imputed to the employer when harassment is pervasive. *Fisher,* 53 Wash. App. at 596, 769 P.2d at 320. The authori-

ty actually delegated to the harasser is not controlling. *Vance,* 863 F.2d at 1512. Similarly, a union may be liable for the acts of its stewards, even when they violate union policy. *Dutrisac v. Caterpillar Tractor Co.,* 749 F.2d 1270, 1274 (9th Cir. 1983); *NLRB v. International Longshoremen's & Warehousemen's Union,* 283 F.2d 558 (9th Cir.1960).

An employer may avoid liability by taking "prompt and adequate corrective action." *Glasgow,* 103 Wash.2d at 407, 693 P.2d at 712. Here, the Union had both actual and constructive notice of the pervasively hostile environment and the acts of Floyd. There is no indication that any action was taken by the Union against Floyd or Burnham. By failing to act, the Union effectively ratified the harassment. "We are not persuaded that unions are powerless to make their agents observe the contractual ... limits more carefully." *Dutrisac,* 749 F.2d at 1274 (discussing time limits).

Our review of Washington law leads us to conclude that Washington courts would hold that racial harassment by union officials, including stewards entrusted with implementing the grievance process, may constitute acts of discrimination by a union. Such harassment occurred here. We affirm on this additional ground the district court's holding that the Union violated Wash.Rev.Code § 49.60.190.

### B

 Under 42 U.S.C. § 1981, "all persons" are guaranteed the "same right ... to make and enforce contracts ... as is enjoyed by white citizens." Racial harassment alone does not violate § 1981. *Patterson v. McLean Credit Union,* 491 U.S. 164, 176, 109 S.Ct. 2363, 2373, 105 L.Ed.2d 132 (1989); *Courtney,* 899 F.2d at 849. But a union, entrusted with the enforcement of a labor contract, may violate the statute if by racial discrimination it interferes with its members' ability to enforce

---

**7.** Accordingly, the employee need not exhaust internal remedies before bringing an action.

*Hacienda,* 881 F.2d at 1516.

their contract. *Patterson*, 491 U.S. at 177, 109 S.Ct. at 2373; *Goodman*, 482 U.S. at 669, 107 S.Ct. at 2625. This is particularly true when the contract contains an explicit antidiscrimination clause. *See id.*

The district court found that the Union systematically failed to file a grievance on behalf of Woods concerning the racial atmosphere in the plant. Such a failure may constitute a violation of § 1981. *Id.* The Union responds that its decision not to file a grievance was a matter of union discretion, to which the deferential "duty of fair representation" standard of *Vaca v. Sipes*, 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967), should apply. We reject this suggestion. There is no authority for analogizing between the civil rights statutes and *Vaca*.[8] *See* A. Larson, *Employment Discrimination* § 44.20 at 9–22 to 9–27 (1990) (discussing Title VII). Section 1981 is a statutory remedy, specifically designed to guarantee persons of all races "access to legal process that will address and *resolve* contract-law claims without regard to race." *Patterson*, 491 U.S. at 177, 109 S.Ct. at 2373 (emphasis added). Here, the Union's "good faith" efforts to enforce the contract "informally" were notoriously ineffective. The process, conducted by one of the harassers, barely addressed, much less resolved, Woods' complaints.

Liability under § 1981 requires a showing of discriminatory motive. *Goodman*, 482 U.S. at 665 n. 10, 107 S.Ct. at 2623 n. 10; *General Bldg. Contractors Ass'n v. Pennsylvania*, 458 U.S. 375, 381, 102 S.Ct. 3141, 3145, 73 L.Ed.2d 835 (1982). The district court explicitly found that the Union had "discriminatory and evil motives" here. We affirm.

### C

■ The duty of fair representation is a judicially created duty arising out of the statutory grant of exclusive representation to unions under the Railway Labor Act, *Steele v. Louisville & Nashville RR Co.*, 323 U.S. 192, 204, 65 S.Ct. 226, 232, 89 L.Ed. 173 (1944), and the National Labor Relations Act, *Ford Motor Co. v. Huffman*, 345 U.S. 330, 73 S.Ct. 681, 97 L.Ed. 1048 (1953). Its purpose is to implement the intent of Congress that all unions represent their members "without hostile discrimination, fairly, impartially and in good faith." *Steele*, 323 U.S. at 204, 65 S.Ct. at 233.

A union does not violate the duty of fair representation unless it acts in a manner that is arbitrary, discriminatory or in bad faith. *Vaca*, 386 U.S. at 177, 190, 87 S.Ct. at 909, 916. Mere negligence is not enough. *Peterson v. Kennedy*, 771 F.2d 1244, 1253 (9th. Cir.1985), *cert. denied*, 475 U.S. 1122, 106 S.Ct. 1642, 90 L.Ed.2d 187 (1986). Thus, a union need not process meritless grievances. *Galindo*, 793 F.2d at 1513.

Racial discrimination in grievance processing constitutes a primary violation of the duty. *Steele*, 323 U.S. at 204, 65 S.Ct. at 232. Similarly, reckless disregard of the rights of an individual member constitutes an "arbitrary" failure to represent him. *Peterson*, 771 F.2d at 1254. Here, the district court found intentional and knowing failure to file grievances on behalf of Woods concerning racial harassment. While it did not ignore Woods altogether, the Union's treatment of his harassment grievances never rose above the most informal level. We agree with the district court that the Union violated the duty of fair representation.

### IV

■ The Union next argues that the district court erroneously found it liable for the tort of outrage against Woods. We disagree.

Under Washington law, conduct must be extreme and outrageous to constitute the tort of outrage. *Contreras v. Crown Zellerbach Corp.*, 88 Wash.2d 735, 565 P.2d 1173, 1176–77 (1977) (en banc). Intent,

---

**8.** In construing § 1981, courts may also not analogize to Title VII, *General Bldg.*, 458 U.S. at 383–84 n. 8, 102 S.Ct. at 3146–47 n. 8.

malice, and behavior sufficient to justify the award of punitive damages are not enough. The conduct must be "beyond all reasonable bounds of decency" and "intolerable" in a civilized society. The plaintiff must show severe emotional distress. *Id.*

The district court found that the Union, through its agent, joined in discriminatory practices and refused to process grievance claims. The court concluded the conduct was motivated by discriminatory and evil motives. The court found the conduct was "outrageous" and "shocks the conscience of this society." Based on uncontroverted medical evidence, the court found that Woods suffered "severe mental, emotional and physical harm," for which he was treated by medication and psychiatric treatment. The Washington Supreme Court has held that whether conduct constitutes extreme outrage is for the trier of fact to determine, taking into account changing social conditions and the plaintiff's susceptibility. *Id.* 565 P.2d at 1177. The Union has not shown the district court's factual findings to be erroneous. We therefore affirm the district court's holding of tort liability.

## V

The district court awarded Woods general, special and punitive damages. The Union does not challenge the district court's award of general damages. The Union does challenge the award of punitive damages and the apportionment of Woods' special damages.

## A

 Damages for violations of § 1981 are awarded under 42 U.S.C. § 1988.[9] Under § 1988, we must look to the common law when a statute such as § 1981 lacks an explicit damages provision. Under § 1981, the common law rule is that punitive damages may be awarded in appropriate cases. *Patterson*, 109 S.Ct. at 2375 n. 4; *Johnson v. Railway Express*, 421 U.S. 454, 460, 95 S.Ct. 1716, 1720, 44 L.Ed.2d 295 (1975).[10] Accordingly, punitive damages may be awarded against a corporation for a violation of § 1981. *Mitchell v. Keith*, 752 F.2d 385, 389–90 (9th Cir.), *cert. denied*, 472 U.S. 1028, 105 S.Ct. 3502, 87 L.Ed.2d 633 (1985). Punitive damages may also be awarded against a union in a § 1981 action. *Allen v. Amalgamated Transit Union Local 788*, 554 F.2d 876, 883–84 (8th Cir.), *cert. denied*, 434 U.S. 891, 98 S.Ct. 266, 54 L.Ed.2d 176 (1977) (cited with approval in *Mitchell*, 752 F.2d at 389). We review *de novo* whether punitive damages are available here. *Tibbs v. Great American Ins. Co.*, 755 F.2d 1370, 1374 (9th Cir.1985).

The Union first argues that the duty of fair representation is the "common law" applicable to this case.[11] Since punitive damages may not be awarded against a union for a violation of the duty of fair representation, *see International Brotherhood of Electrical Workers v. Foust*, 442 U.S. 42, 52, 99 S.Ct. 2121, 2127, 60 L.Ed.2d 698 (1979) (discussing Railway Labor Act (RLA)), the Union suggests, punitive damages are not appropriate here.

9. 42 U.S.C. § 1988 reads, in pertinent part:
The jurisdiction ... conferred ... for the protection of all persons in the United States in their civil rights, and for their vindication, shall be exercised and enforced in conformity with the laws of the United States, so far as such laws are suitable to carry the same into effect; but in all cases where they are not adapted to the object, or are deficient in the provisions necessary to furnish suitable remedies ... the common law ... shall be extended to and govern the ... disposition of the cause.

10. Other courts have considered this rule well settled, *see Stallworth v. Shuler*, 777 F.2d 1431, 1435 (11th Cir.1985) (punitive damages are "of

course" available under § 1981); as have we. *See Miller v. Fairchild Industries, Inc.*, 797 F.2d 727, 733 (9th Cir.1986).

11. The Union also observes, correctly, that punitive damages are not available under Title VII, *Williams v. United States Gen'l Svcs. Admin.*, 905 F.2d 308 (9th Cir.1990); or against a municipality under § 1983, *Newport v. Fact Concerts*, 453 U.S. 247, 271, 101 S.Ct. 2748, 2762, 69 L.Ed.2d 616 (1981). The Union also correctly notes that damages against unions are disfavored, *Vaca*, 386 U.S. at 197, 87 S.Ct. at 920, as are punitive damages generally. *Protectus Alpha Navigation Co. v. North Pacific Grain Growers, Inc.*, 767 F.2d 1379, 1385 (9th Cir.1985).

We disagree. In *Newport v. Facts Concerts*, 453 U.S. 247, 271, 101 S.Ct. 2748, 2762, 69 L.Ed.2d 616 (1981), the Supreme Court held that punitive damages are not available against a municipal corporation for a violation of 42 U.S.C. § 1983 because municipalities enjoy traditional common law immunity from punitive damages, *id.* at 258, 101 S.Ct. at 2755, and such damages would work a hardship on innocent taxpayers. *Id.* at 267, 101 S.Ct. at 2759. The Union argues that the same reasoning underlies *Foust* and supports extending its rule to civil rights actions. The Union is only partially correct. In *Foust*, the Supreme Court held that the potential hardship on the collective interest of innocent members outweighed the reasons for awarding punitive damages. *Foust*, 442 U.S. at 50, 99 S.Ct. at 2126. But *Foust* and *Newport* differ in another fundamental respect. At common law, municipalities have long enjoyed immunity from punitive damages. *Newport*, 453 U.S. at 259, 101 S.Ct. at 2755. Unions, by contrast, have not. *See, e.g., International Union, United Automobile, Aircraft & Agricultural Implement Workers v. Russell*, 356 U.S. 634, 646, 78 S.Ct. 932, 939, 2 L.Ed.2d 1030 (1958) (punitive damages are a "well-settled" form of relief under state law and may apply to unions).

Punitive damages are available against unions for violations of other labor laws, particularly the Labor Management Reporting and Disclosure Act (LMRDA). *See International Brotherhood of Boilermakers v. Braswell*, 388 F.2d 193, 199 (5th Cir.), *cert. denied*, 391 U.S. 935, 88 S.Ct. 1848, 20 L.Ed.2d 854 (1968); *Cooke v. Orange Belt Dist. Council of Painters*, 529 F.2d 815, 820 (9th Cir.1976) (adopting *Braswell* rule). The *Foust* court, recognizing the difference, explicitly held that its decision did not apply to cases brought under the LMRDA. *Foust*, 442 U.S. at 47 n. 9, 99 S.Ct. at 2125 n. 9. Cases holding such damages available have survived reexamination in light of *Foust. See Parker v. Local Union No. 1466, United Steelworkers of America*, 642 F.2d 104, 107 (5th Cir.1981) (affirming *Braswell* ); *Bise v. International Brotherhood of Electrical Workers*, 618 F.2d 1299, 1305 (9th Cir.1979) (affirming *Cooke* ), *cert.*

*denied*, 449 U.S. 904, 101 S.Ct. 279, 66 L.Ed.2d 136 (1980); *see also Quinn v. DiGiulian*, 739 F.2d 637, 648 (D.C.Cir.1984) (listing cases and citing *Cooke* with approval).

Similarly, the *Allen* court, examining the law as it existed before *Foust*, concluded that there was no barrier to awarding punitive damages against a union under § 1981. *Allen*, 554 F.2d at 883–84. We have continued to cite *Allen* for the proposition that punitive damages are generally available under § 1981. *See White v. Washington Public Power Supply System*, 692 F.2d 1286, 1290 (9th Cir.1982); *Mitchell*, 752 F.2d at 389. We conclude that the rule of *Foust* does not establish a common law immunity that prevents the award of punitive damages for a violation of § 1981.

The Union next argues that Woods' duty of fair representation claim and his § 1981 claim are "equivalent federal right[s]" requiring similar remedies. Again we disagree.

In *Quinn*, the District of Columbia Circuit looked closely at the rationale for distinguishing LMRDA violations from duty of fair representation cases. It noted that an award of punitive damages under either law has an equal impact on a union and its members. *Quinn*, 739 F.2d at 650; *see Foust*, 442 U.S. at 50–52, 99 S.Ct. at 2126–2128. However, the reasons justifying the award are different. The duty of fair representation creates a tension between the interests of the individual and the interests of the whole that must be balanced. Under the labor Bill of Rights, on the other hand, if the rights of one member are violated, "the rights of all members of the union are threatened." *Quinn*, 739 F.2d at 650 (quoting *Hall v. Cole*, 412 U.S. 1, 8, 93 S.Ct. 1943, 1948, 36 L.Ed.2d 702 (1973)). Thus the interests of the individual converge with the interests of all members and punitive damages are acceptable.

This reasoning supports the distinction we make here. Punitive damages are inconsistent with the labor policy of the RLA and NLRA, which are designed to promote industrial peace. *See Foust*, 442 U.S. at 47–48, 99 S.Ct. at 2125–2126. In *Bise*, by

contrast, we noted that the "overall thrust of the [LMRDA] was to protect the individual *rights* of union members and to deter abuse and denial thereof by union officers." *Bise*, 618 F.2d at 1305 n. 6 (emphasis added). The rights protected by § 1981 are at least as fundamental as those protected by the labor Bill of Rights. Section 1981 guarantees civil rights belonging to "all persons" that preceded our national labor policy by nearly a century.[12]

Finally, a union may be liable for the same wrongs as an employer if it discriminates in violation of § 1981. *McDonald*, 427 U.S. at 285, 296, 96 S.Ct. at 2581, 2586. An employer may be liable for punitive damages under § 1981. *Mitchell*, 752 F.2d at 389. We see no reason to treat the Union differently here.

▮▮ We next must determine if the district court's award was justified. We review the award for substantial evidence. *Tibbs*, 755 F.2d at 1374.

▮▮ An award of punitive damages requires two findings of fact. First, the conduct of the defendant must "meet the recklessness threshold"; and second, the factfinder must make "a discretionary moral judgment" that the "conduct merited a punitive award." *Smith v. Wade*, 461 U.S. 30, 52, 103 S.Ct. 1625, 1638, 75 L.Ed.2d 632 (1983). "Punitive damages are awarded in the jury's discretion 'to punish [the defendant] for his outrageous conduct and to deter him and others like him from similar conduct in the future'" because "society has an interest in deterring and punishing *all* intentional or reckless invasions of the rights of others." *Id.* at 54, 103 S.Ct. at 1639 (citing *Restatement (Second) of Torts* § 908(1)) (emphasis in original). To be liable, a union must act with "actual malice or reckless or wanton indifference." *Bise*, 618 F.2d at 1305.

▮▮ Here, the district court, as factfinder, made the necessary determination. It awarded punitive damages because the Union's conduct was "outrageous" and "shocks the conscience of this society." It also found the Union had "reckless disregard and callous indifference for the violation of Woods' rights." These findings are supported by the record and satisfy the test of *Smith*.

The Union argues that the district court's calculation of the amount of punitive damages was made before the Supreme Court's decision in *Patterson*, which limits Woods' § 1981 action of impairment of access to the dispute resolution process. *Patterson*, 109 S.Ct. at 2373. Because harassment and other forms of discrimination are no longer actionable under § 1981, the Union argues, the award must be reduced proportionally.

We agree that there may have been error here. *Patterson* must be applied retroactively to cases pending in this circuit at the time *Patterson* was decided. *Courtney*, 899 F.2d at 849. The district court's calculation of damages was made before *Patterson* and may reflect more than the § 1981 claim alone. We therefore remand to the district court to recalculate, in its sound discretion, the punitive damage award in light of *Patterson*.

### B

▮▮ Compensatory damages are ordinarily apportioned between an employer and a union. *Vaca*, 386 U.S. at 196–98, 87 S.Ct. at 919–921. The district court made such an apportionment in determining the general damage award, but did not apportion Woods' special damages. The Union argues that the award of special damages should be apportioned as well.

We agree. We remand the special damage award to the district court for redetermination.

### VI

▮▮ The district court awarded attorneys' fees and costs to Woods under Wash.

---

12. As the Supreme Court has stated, there is "no reason why a person whose federally guaranteed rights have been violated should be granted a more restrictive remedy than a person asserting an ordinary tort cause of action." *Smith v. Wade*, 461 U.S. 30, 48–49, 103 S.Ct. 1625, 1636, 75 L.Ed.2d 632 (1983).

Rev.Code § 49.60.030(2) and 42 U.S.C. § 1988. We review the district court's award of fees in a civil rights action for abuse of discretion. *Hardin v. White Mountain Apache Tribe,* 779 F.2d 476, 480 (9th Cir.1985).

In order to apportion fees between the Union and Princeton, the district court divided the lawsuit into three phases. Phase I consisted entirely of work performed before the Union was a party to the lawsuit. Phase II included work performed while both Princeton and the Union were parties, and Phase III included work performed after Princeton was dismissed. The Union does not challenge the court's award of fees for half of Phase II and all of Phase III.

During Phase I, however, Woods' first attorney pursued matters that had little to do with Woods' claims against the Union. The Union argues that it should not be liable for half the fees for this phase. It argues that the party that was the focus of the litigation should bear the bulk of costs, citing *Sable Communications of California v. Pacific Telephone & Telegraph,* 890 F.2d 184, 194 (9th Cir.1989).

We would agree except that Phase I also included Woods' efforts to answer Princeton's interrogatories, which assisted him in preparing his case against the Union. The amended complaint naming the Union was drafted during this period, even if the Union was not successfully served. The Union had notice of the lawsuit, and filed a motion to dismiss for lack of service, all during Phase I. Some portion of Phase I fees is appropriately charged to the Union.

The purpose of a fee award is to encourage litigation, *Holland,* 583 P.2d at 625, and voluntary compliance with civil rights laws. *Sable,* 890 F.2d at 193. The district court considered the Union's arguments on a motion for reconsideration and reduced the Union's share for Phase II. In light of the developmental work that took place during Phase I and the purpose of the fee award, we hold that the district court's award was not an abuse of discretion.

## VII

The district court's findings of fact are not clearly erroneous. The Union consciously chose not to file a formal grievance on Woods' behalf concerning racial harassment in the plant, while it did file grievances on behalf of Woods on other subjects. Moreover, a Union steward and committeeman contributed to the hostile environment, a fact of which the Union was aware, but took no remedial action to correct.

We affirm the district court's holding that the Union violated Wash.Rev.Code Ch. 49.60, 42 U.S.C. § 1981 and the duty of fair representation under the NLRA. We affirm the district court's holding that the Union is liable for the tort of outrage.

The awards of punitive and special damages are remanded for reconsideration not inconsistent with this opinion. The district court's award of Phase I attorneys' fees is affirmed. Each party shall bear its own costs of appeal.

AFFIRMED in part and REMANDED.