[No. B078828. Second Dist., Div. Two. Feb. 6, 1995.]

VENETA GREENE, Plaintiff and Appellant, v.
POMONA UNIFIED SCHOOL DISTRICT et al., Defendants and
Respondents.

RANDALL WILLIAMS, Plaintiff and Appellant, v.
POMONA UNIFIED SCHOOL DISTRICT et al., Defendants and
Respondents.

ZEPHYR TATE-MANN, Plaintiff and Appellant, v.
POMONA UNIFIED SCHOOL DISTRICT et al., Defendants and
Respondents.

**[Opinion certified for partial publication.\*]**

---

*\*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for partial publication. The reporter is directed to publish parts I, II and subpart D of part IV.

**COUNSEL**

Leo James Terrell for Plaintiffs and Appellants.

Lynberg & Watkins, Sue Ann Salmon, Rosalind D. Wolf, Beverly Tucker, Charles R. Gustafson, Robert E. Lindquist and Terri Tucker for Defendants and Respondents.

**OPINION**

**NOTT, J.—**

I.

Appellants Veneta Greene, Randall Williams and Zephyr Tate-Mann bring this appeal following a ruling of the trial court which sustained demurrers without leave to amend.[1] The demurrers, which challenged the second amended complaint (complaint), were brought by respondents Associated Pomona Teachers (APT) and Tom Hollister, and Pomona Unified School District (PUSD) and Neil Romero. We affirm in part and reverse in part.

II.

FACTS AND PROCEDURAL HISTORY

The following facts are taken from the complaint and treated as true. (*Silberg* v. *Anderson* (1990) 50 Cal.3d 205, 210 [266 Cal.Rptr. 638, 786 P.2d 365]; *Coleman* v. *Gulf Ins. Group* (1986) 41 Cal.3d 782, 789, fn. 3 [226 Cal.Rptr. 90, 718 P.2d 77, 62 A.L.R.4th 1083].)

A. *Initial Common Allegations*

Appellants are Black schoolteachers who are employed by the PUSD and are members of APT. Mr. Romero is the principal of Ganesha High School and appellants' supervisor. Mr. Hollister is the executive director of the APT.

During 1991, appellants informed Mr. Romero and Mr. Hollister that the following had occurred at the school: African-American and Mexican-American students are (1) intentionally placed in lower level classes while White students are placed in college preparatory classes, a practice known as "tracking"; (2) assigned lower level textbooks; and (3) repeatedly harassed by White teachers with racial comments and comments about their ability to perform in college. These practices allegedly deny the African- and Mexican-American students the same educational instruction and materials received by the White students at the school, and "alter[] in a racially discriminatory manner" the students' "educational environment."

Appellants also informed Mr. Romero and Mr. Hollister that the African- and Mexican-American teachers were denied the same opportunities to serve as department chairpersons and to teach honor classes despite being more experienced than White teachers who received those assignments.

---

[1]The separate actions filed by the three appellants were consolidated by the trial court.

Neither individual respondent took corrective measures to eliminate the practices.

In November 1991, appellants gave the individual respondents a memo concerning the practices, but no corrective action was taken.

### B. *Allegations From the Williams Complaint*

During the 1991-1992 school year, appellant Williams was the faculty adviser to the African-American Student Union Organization, which sponsored programs promoting the accomplishments of African-Americans. Mr. Williams requested funding for the organization, but responses to the requests were intentionally delayed by the PUSD's activities director. Funding requests for organizations sponsored by White faculty members were not subject to delays.

In January 1992, appellant Williams submitted to Mr. Romero a request for funding from the multicultural budget to finance a program celebrating the accomplishments of outstanding minorities. He was informed that no funds existed for such a program. After Mr. Williams stated that he would make an inquiry into the status of the budget, Mr. Romero said that funding was available and authorized the funding request. Appellant Williams nevertheless looked into the matter and learned that funds were always available for the multicultural program. He alleged his belief that Mr. Romero intentionally misrepresented the status of the account to prevent the program from occurring and that organizations sponsored by White teachers were not subject to that intentional misrepresentation.

In April 1992, respondent Romero asked the teachers to participate in an ad hoc committee to make recommendations for education improvements at the school. Mr. Williams volunteered but was refused a place on the committee.

### C. *Allegations From the Mann Complaint*

During the 1991 school year, Ms. Mann was the certificated employee in charge of the career center at Ganesha High School. As such, she provided scholarship and financial aid information to the students. Without notice or cause, she was removed from that position and replaced by a White male librarian. She alleged her belief that she was removed from the position because of her opinions regarding the discriminatory acts and disparate treatment of minority teachers and students.

During the 1991-1992 school year, appellant Mann taught a United States government class. All government classes at Ganesha were assigned textbooks, except her third period class. Ms. Mann repeatedly requested textbooks for her class from Mr. Romero and the chairperson of the

department. No textbooks were ever provided, she alleged, because of her opinions regarding the discriminatory acts and disparate treatment of minority teachers.

For 10 years, Ms. Mann was the work experience coordinator at Ganesha High School. For the previous six years she met with her students during periods five and six in room 22. In January 1992, she was informed that room 22 was no longer available for the meetings. She alleged that she believes that was an act of retaliation for her opinions.

### D.   *Allegations From the Greene Complaint*

On or about November 25, 1991, Ms. Greene found the following message on her classroom door: "Fuck you, ruck ha ha fucker on the door." Inside the door was written "KFC." The word "bitch" was written inside the other door in the room. In December 1992, appellant Greene found a Ku Klux Klan Christmas card on her desk. Later that month, Ms. Greene entered her classroom and found a desk, stool and chair turned over in the doorway. On the desk was a paper with the words, "Fuck you 666 my name you know." On March 13, 1992, everything on top of appellant Greene's desk had been knocked off the desk. On the blackboard was written, "Fuck HSG." Ms. Greene reported these incidents to Mr. Romero and Mr. Hollister, but no responsive action was taken.

### E.   *Subsequent Common Allegations*

Throughout the 1992 school year, appellants continued to express concerns about the discriminatory treatment given to minority students and teachers, and about the racist hate messages and acts directed at them. Mr. Romero and Mr. Hollister failed to take corrective action. Appellants attended faculty meetings, parent-teacher meetings and school board meetings and voiced their opinions about discrimination at the school.

In January 1992, Mr. Romero requested all teachers to sign up for school site committees, designed to recommend educational improvements at the school. Appellants signed up to become members, but Mr. Romero would not assign them to a committee. They believe that they were intentionally excluded because of their opinions about the discrimination at the school.

On January 31, 1992, appellants filed complaints of racial discrimination, harassment and retaliation with the Department of Fair Employment and Housing (DFEH). They also filed a complaint with the Equal Employment Opportunity Commission (EEOC).

On February 28, Mr. Romero called an emergency faculty meeting, attended by Mr. Hollister and the PUSD's superintendent. The latter expressed his displeasure that some teachers were stating opinions to the media

about discriminatory practices at the school. Appellants stated at the meeting that they would continue to express their opinions.

On March 13, 1992, each appellant received a hate letter in their teacher mailbox. The letters contained racist and derogatory comments about them and about African-Americans. They reported the incident to respondents Romero and Hollister, but no responsive action was taken.

On June 22, 1992, each appellant filed a government tort claim for personal damages against respondents. In June, they also filed this action.

In addition, appellants Williams and Greene received a letter from respondent Romero stating that he had recommended that they be transferred to a different school effective September 8, 1992. For each the transfer is a demotion in responsibilities, salary and prestige.

Appellants Williams and Greene asked that the transfer be rescinded. On July 6, 1992, they received a letter stating that the transfer was made in accordance with PUSD policy, but no specific reasons were mentioned for the transfer. On June 18, 1992, the PUSD's superintendent told a local newspaper that the transfer was made to smooth tensions at Ganesha High School.

All appellants received a right-to-sue letter and filed this action. The complaints allege violations of (1) the California Fair Employment and Housing Act (FEHA) (Gov. Code, § 12900 et seq.), (2) article I, section 8 of the California Constitution, and (3) title VII of the Civil Rights Acts of 1964 (42 U.S.C. §§ 2000e-2000e-17); (4) intentional infliction of emotional distress; and violations of (5) the First and Fourteenth Amendments of the United States Constitution, (6) article I, sections 2, subdivision (a), and 3 of the California Constitution, (7) 42 United States Code section 1981 and (8) 42 United State Code section 1981a.

The trial court sustained the demurrers without leave to amend as to all causes of action alleged against the APT, Mr. Hollister and Mr. Romero. The demurrer of the PUSD was overruled as to the FEHA and title VII causes of action.

III.*

CONTENTIONS

. . . . . . . . . . . . . . . . . . . . . . . . . . .

---

*See footnote, *ante,* page 1216.

## IV.

### DISCUSSION

### A.-C.*

· · · · · · · · · · · · · · · · · · · · · · · · · · · · · · ·

### D. *The FEHA and Title VII Causes of Action Against APT*

Appellants correctly assert that Government Code section 12940 prohibits unions from engaging in racial discrimination. (§ 12940, subd. (b).)[4] They are also correct in stating that title VII (42 U.S.C. § 2000e et seq.) applies to unions.[5] (*Goodman* v. *Lukens Steel Co.* (1987) 482 U.S. 656, 667 [96 L.Ed.2d 572, 585-586, 107 S.Ct. 2617].) Title VII prohibits discrimination by unions to the same extent that it prohibits discrimination by employers. (*Bonilla* v. *Oakland Scavenger Co.* (9th Cir. 1982) 697 F.2d 1297, 1304, cert. den. 467 U.S. 1251 [82 L.Ed.2d 838, 104 S.Ct. 3533]; citing *McDonald* v. *Sante Fe Trail Transp. Co.* (1976) 427 U.S. 273, 284-285 [49 L.Ed.2d 493, 502-504, 96 S.Ct. 2574].) ■ Based solely on those principles, appellants argue that the trial court erred in sustaining the demurrer with respect to the APT because the APT "took absolutely no action" in response to their complaints about discrimination at Ganesha High School.

APT argues that it is liable for failing to act only when it has a duty to act, and that it has no such duty "in the absence of explicit language in the collective bargaining agreement which either illegally discriminates or prohibits discrimination." We agree with the APT that case law supports its position.[6] For example, in *Goodman* the collective bargaining agreement included an express clause binding both the employer and the union not to discriminate on racial grounds. (482 U.S. at p. 666 [96 L.Ed.2d at p. 585].) In *Bonilla*, the employer had a shareholder preference plan which was found to have a clearly disparate impact on the minority employees. The court

---

*See footnote, *ante*, page 1216.

[4]"It shall be an unlawful employment practice . . . : (b) For a labor organization, because of . . . race . . . to discriminate in any way against any of its members . . . ." (§ 12940, subd. (b).)

[5]"(c) It shall be an unlawful employment practice for a labor organization (1) . . . to discriminate against, any individual because of his race . . . ; [¶] (2) to limit . . . any individual, in any way which would deprive or tend to deprive any individual of employment opportunities, or would limit such employment opportunities or otherwise adversely affect his status as an employee . . . because of such individual's race . . . ; or [¶] (3) to cause or attempt to cause an employer to discriminate against an individual in violation of this section." (42 U.S.C. § 2000e-2.)

[6]As already noted in the unpublished portion of this opinion, given that the state and federal antidiscrimination statutes are identical in their objectives, California courts look to federal law to interpret analogous provisions of the state statute. (*Clark* v. *Claremont University Center* (1992) 6 Cal.App.4th 639, 662 [8 Cal.Rptr.2d 151].)

found that the complaint sufficiently alleged that the union violated title VII by including the shareholder preference plan in the collective bargaining agreement. (697 F.2d at p. 1303.)

Other cases are consistent. The collective bargaining agreement in *Woods* v. *Graphic Communications* (9th Cir. 1991) 925 F.2d 1195, 1201 like the one in *Goodman*, contained a nondiscrimination provision. The union in *Kaplan* v. *Intern. Alliance of Theatrical, etc.* (9th Cir. 1975) 525 F.2d 1354, 1360, like the one in *Bonilla*, was held subject to liability for including in the bargaining agreement a provision which was found to perpetuate past discriminatory effects.

In this case, appellants did not allege that the collective bargaining agreement contained an antidiscrimination clause, nor did they allege that the bargaining agreement itself was discriminatory. On appeal they rely on *Goodman*, which is distinguishable. Appellants fail to cite any authority which supports their argument that the APT had an implicit duty to represent them in this matter. Moreover, we would not expect to be persuaded by such authority. The union and its members should have the discretion to determine which areas of employment will be covered by the collective bargaining agreement. If the union and the membership want to include an antidiscrimination clause in the agreement, that can be negotiated with the employer. The union and the members may decide against having such a provision, however. They may determine that, for example, including it would expand the union's responsibility to pursue grievances. That added burden would likely increase the union's budget and thus membership dues. We are reluctant to impose such a burden on unions in the absence of a clear legislative directive. As we see it, individuals with claims of discrimination against their employer based on race, gender, disability or any other aspect of their person protected by the antidiscrimination statutes have remedies available to them through the DFEH and the EEOC, as well as civil actions under title VII and Government Code section 12940. Thus, there is no need to require unions to become involved without a prior decision on the part of the union to do so.

We note and distinguish one additional case: *Johnson* v. *Palma* (2d Cir. 1991) 931 F.2d 203. There, an employee filed a grievance after being suspended for habitual lateness. While the grievance was proceeding the employee was fired, and he filed a racial discrimination complaint with the New York State agency that accepts such complaints. Because of the filing of the complaint, the union subsequently refused to proceed on the grievance, a decision that was held to be retaliatory and an unlawful employment practice in violation of title VII. (931 F.2d at p. 207.) Because the grievance was not based on racial discrimination, however, we do not regard *Johnson*

as authority for allowing the appellants to proceed against the union in this case.

Furthermore, appellants do not direct this court to language in the collective bargaining agreement to support their argument that the union had a duty to represent them in all the terms and conditions of their employment. In fact, article 6 of the collective bargaining agreement provides that the grievance procedure is limited to violations of "the specific provisions" of the agreement. Thus, the agreement contradicts appellants' position.

We therefore hold that under the collective bargaining agreement, the APT had no duty to represent appellants in their discrimination claims. We also hold that the union has no general duty to represent appellants in matters of employment not covered by the collective bargaining agreement.

E.-H.*

.  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .

## V.

### CONCLUSION

We affirm the following aspects of the trial court's ruling: the sustaining of demurrers (1) of all respondents to the intentional infliction of emotional distress and the California Constitution, article I, section 8, causes of action; (2) of the APT and Mr. Hollister to all causes of action; and (3) of Mr. Romero to the FEHA and 42 United States Code section 1981a causes of action.

We reverse the sustaining of the demurrers of the PUSD and Mr. Romero to the causes of action brought under (1) article I, section 2, subdivision (a), of the California Constitution; (2) the federal Constitution; and (3) 42 United States Code section 1981. We also reverse the ruling on the PUSD's demurrer to the 42 United States Code section 1981a cause of action.

The parties are to bear their own costs on appeal.

Boren, P. J., and Fukuto, J., concurred.

---

*See footnote, *ante*, page 1216.