Blanca AGOSTO, Plaintiff,

v.

CORRECTIONAL OFFICERS BENEVOLENT ASSOCIATION, Defendant.

No. 98 CIV. 7233(DLC).

United States District Court, S.D. New York.

July 24, 2000.

Margaret M. Shalley, New York City, for Plaintiff.

Joseph A. Turco, Dana B. Rubin, Dienst & Serrins, LLP, New York City, for Defendant.

### OPINION and ORDER

COTE, District Judge.

Plaintiff Blanca Agosto ("Agosto") filed this action *pro se* on October 14, 1998, seeking redress for alleged discrimination and retaliation by her union, defendant Correction Officers' Benevolent Association ("COBA" or "Union"), in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"). Following this Court's December 30, 1998 denial of a motion to dismiss, Agosto retained counsel. Discovery has been completed and COBA now moves for summary judgment to dismiss the entire action. For the following reasons, the motion is denied in part and granted in part.

### BACKGROUND

Agosto principally complains that her union representative participated in and encouraged a campaign of sexual harassment and retaliation by her fellow corrections officers. She accuses COBA of failing both to discipline that representative and to represent and protect her in the workplace. According to Agosto, those failures encouraged her fellow officers to discriminate and retaliate against her for her complaints about sexual harassment. The following facts are either undisputed or as described by the plaintiff and her former partner, Amado Pla ("Pla"), unless otherwise indicated.

Agosto was employed by the New York City Department of Corrections ("DOC") and was a member of COBA from 1981 until 1998. Beginning in 1991, she was assigned to the Bellevue Hospital Prison Ward ("Bellevue"). During the period 1995 to 1996, Agosto was assigned to the day shift on that ward with nineteen other officers. In late 1995, a fellow officer showed Agosto sexually explicit photographs of female Corrections Officer Lydia Soler ("Soler") that Soler had been showing in the workplace. The officer also suggested that Agosto pose with him for a similar photograph. After Agosto complained to Soler about the photographs, tensions developed between the two women, culminating in a physical altercation between them in January 1996. When the Deputy Warden interviewed Agosto in February 1996 about this incident, Agosto explained that she had asked Soler to stop displaying sexually explicit photographs. The Deputy Warden responded that he did

not consider Soler's photographs to be offensive and that to his knowledge Soler had been showing such photos since long before the Deputy Warden's employment at Bellevue.

*Agosto's Report to DOC/EEO and its Aftermath*

On February 14, 1996, Agosto went to the DOC Equal Employment Opportunity Office ("DOC/EEO") and described both the photographs and the Deputy Warden's response to her complaints.[1] She indicated that she did not yet wish to file a formal complaint. Agosto requested that the DOC/EEO office keep the conversation confidential.

The very next day, February 15, the Deputy Warden reprimanded Agosto for complaining about him to the EEO. He threatened to transfer her and asked for a written report of the altercation with Officer Soler. When Agosto gave him the report, he directed her to leave out any reference to the photographs.[2]

*Agosto's DOC/EEO Complaint and Requests to COBA for Assistance*

On February 16, Agosto faxed a written complaint to DOC/EEO. Agosto has not provided a copy of that complaint, but it apparently alleged that she was a victim of sexual harassment.

Although Agosto was not on good terms with her union delegate Ronald Hendrickson ("Hendrickson"), she complained to him and to COBA president Norman Seabrook ("Seabrook") about the Deputy Warden's handling of her complaint regarding sexual harassment. Both said they would look into these issues. Agosto also asked for Hendrickson's assistance with her sexual harassment complaint. Agosto attempted to follow up with Hendrickson, but Hendrickson did not respond. These conversations with Hendrickson and Seabrook apparently constitute Agosto's request that COBA assist her in pursuing a sexual harassment grievance. COBA does not dispute this characterization.

Hendrickson then began making derogatory comments about women, calling Agosto names, and criticizing Agosto to other officers. At some point, Agosto caught Hendrickson going through her personnel file and later heard him tell others that she had been disciplined, suspended, and administratively transferred. Agosto called the Union to complain that Hendrickson had used his position as a union delegate to get a copy of her personnel records.

On March 6, Seabrook wrote to Agosto stating that he had forwarded her DOC/EEO complaint to a COBA attorney and had asked the attorney to assist Agosto in any way possible.[3] He added that COBA does not handle DOC/EEO complaints. Thereafter, two attorneys representing COBA separately advised Agosto that COBA could not assist her because sexual harassment issues were not grievable.

*Agosto's New York State Division of Human Rights Complaint*

On March 20, 1996, Agosto filed a complaint with the New York State Division of Human Rights against DOC complaining of sexual harassment and retaliation. Soon after filing the complaint, Agosto discovered a sexually explicit photo of Soler in her mailbox.

Hendrickson continued his verbal abuse of Agosto, and in April, Agosto overheard him warning a fellow officer at a labor-

---

**1.** Agosto also withdrew a prior complaint to DOC/EEO that had been settled with the assistance of her union delegate.

**2.** COBA argues that the statement in her affidavit that she was directed to *change* her report contradicts Agosto's deposition testimony that the Deputy Warden told her what to *put in* her report. In answer to the very next question at her deposition, Agosto stated

that the Deputy Warden "was trying to get me to change my report."

**3.** As noted above, Agosto states that she faxed a complaint to DOC/EEO on February 16. Seabrook's March 6 letter refers to a February 27 complaint. It is unclear if Agosto filed a second complaint, or if this is a reference to the February 16 complaint.

management meeting that Agosto and her partner Pla were wearing hidden tape recorders. Hendrickson admits telling the Deputy Warden that Agosto and Pla were allegedly "wired." At roll call, the Deputy Warden announced that he had reason to believe two officers were taping conversations and that if true, those officers would face disciplinary charges and termination. Officers then searched Agosto and Pla, while Hendrickson and the alternate COBA delegate looked on and laughed. Someone drew pictures in the officers' lounge of Agosto and Pla wearing "wires." There was also graffiti in the men's locker area and in the bathrooms referring to Agosto and Pla as "rats" and "snitches." Agosto no longer felt safe performing her work. She doubted that fellow officers would come to her assistance if she needed them, and she experienced some confirmation of her fears. When corrections officers were required to attend sexual harassment training, Hendrickson commented that Agosto was to blame.

*Agosto's First Two Complaints Filed with COBA About Hendrickson*

Agosto and Pla complained to COBA Vice President Israel Rexach ("Rexach") about the situation, and on April 3, 1996, Agosto filed a complaint against Hendrickson with COBA. The two-page written complaint accused Hendrickson of not using objective criteria to judge situations, of being misguided and uninformed about his duties as a union delegate, of relying on the Deputy Warden, and of retaliating against her in response to her complaint to DOC/EEO. Agosto also accused Hendrickson of making unspecified rude comments to her and of showing "playboy magazines" to other officers. Although Rexach met with Hendrickson once in April regarding the problems with Agosto and Pla, he did not question Hendrickson specifically about the allegations of sexual harassment and retaliation.

On May 17, 1996, Agosto sent a memorandum to Seabrook containing a griev-

ance against the Deputy Warden. The memorandum again complained about Hendrickson, specifically that he was spreading false rumors about her and looking at sexually explicit materials in the workplace. In the memo, Agosto requested legal representation for her "Step II Grievance."[4] On May 20, 1996, Agosto filed a second complaint with COBA against Hendrickson, alleging that he had engaged in dishonesty as a union representative, conspiracy with management, retaliation, and failure to represent her. On that same date, Agosto's partner filed a grievance with DOC/EEO alleging retaliation for his having supported Agosto's DOC/EEO complaint.

*Failure to Provide Representation*

On May 21, 1996, Agosto was required to attend a "corrective interview" on charges that she had failed to salute a superior officer, had failed to respond to an alarm, and had been unprofessional while on duty. As described in a COBA newsletter,

> [t]he COBA members have a right to representation at any formal or informal meeting where disciplinary charges may be brought.... The union recommends that you call your Delegate for assistance with any kind of inquiry.

A summary of COBA members' due process rights advises members that for a "command discipline" interview,

> [i]n the event your union rep. is not available you may contact the union for central representation. And the COBA must notify DOC Office of Labor Relations to allow that office to make necessary arrangements to allow an Executive Board member to be present at the interview.

Agosto asked Rexach for a COBA representative other than Hendrickson to attend the May 21 corrective interview with her. No COBA representative appeared at the interview and Agosto refused to sign the

---

4. It is unclear to what Agosto is referring    when she alludes to the Step II Grievance.

report of the interview because she had been "without representation."[5]

*Agosto's Third and Fourth Complaints to COBA About Hendrickson*

On May 24, Agosto filed a third written complaint with COBA against Hendrickson, asserting that he had failed to represent a union member. She again recounted various rude and accusatory remarks that Hendrickson had made to her. She described various sexual harassment complaints she had made against DOC and reported her fear that she would be transferred. This fear, she stated, was based on Hendrickson's threats and his comments that Pla and another officer had already been transferred as a result of their support of her. She concluded by asking how the Union could permit its own representative to discriminate.

Agosto also called the Union to request that a COBA Executive Board member or "someone neutral" represent her at a disciplinary proceeding scheduled for June 4, 1996.[6] No one from COBA attended the June 4 hearing to assist her. As various disciplinary charges were filed by DOC against Agosto, Hendrickson made comments to Agosto expressing his pleasure that she was being disciplined.

On May 26, 1996, Hendrickson filed his own complaint with DOC/EEO against Agosto charging her with aggressive sexual conduct in the workplace. Pla contends that the charges were false and were intended by Hendrickson to provide protection against Agosto's complaints about him.

On May 30, 1996, a COBA attorney wrote to Agosto's private attorney requesting that she ask Agosto to contact him at his office "so that we can aggressively pursue her complaint with the Department of Correction." As the DOC/EEO investigation of Agosto's complaint began in June 1996, fellow officers, with Hendrickson's encouragement, continued to ostracize Agosto. Agosto's calls to Rexach about the situation went unreturned.

On June 3, 1996, Agosto wrote for a fourth time to Seabrook complaining about Hendrickson and the Union's failure to represent a member. She accused Hendrickson of revealing information about her that he had improperly obtained from her personnel folder.

*EEOC Complaint Against COBA*

In a complaint filed with the Equal Employment Opportunity Commisssion ("EEOC") dated July 2, 1996, Agosto accused COBA and Hendrickson of engaging in retaliatory conduct against her. The complaint describes the following: Soler's offensive conduct and the confrontation between the two women; the Deputy Warden's comments minimizing Soler's conduct during the interview that followed the confrontation; the retaliation that followed the interview, including offensive comments from Hendrickson and Hendrickson's claim to fellow officers that Agosto was "wired;" Rexach's and Seabrook's failure to act in response to Agosto's April 3 written complaint against Hendrickson; an April 19, 1996 comment from COBA attorneys that there was nothing offensive about Soler's showing the pictures of herself to other officers; the failure of the Union to act on Agosto's May 17 grievance against the Deputy Warden; Rexach's failure to return a May 21 telephone call to him; and the Union's failure to send a representative to assist Agosto at the June 4 corrective interview.

---

**5.** When Pla called Rexach in April to request a COBA representative other than Hendrickson or Williams to assist him at a corrective interview, Rexach himself attended the interview.

**6.** Agosto asserts that a request for representation was also included in her May 24 complaint to COBA. While she does state in that memo that she was scheduled for a June 4 Command Discipline Hearing on charges of being absent without leave ("AWOL") and of making a false official statement, she does not request representation.

*Additional Requests for Representation*

On July 11, 1996, Agosto wrote to Seabrook requesting that the Union provide a representative for her at a July 31 Office of Administrative Trials and Hearings ("OATH") proceeding. Her letter informed Seabrook that her own attorney would be there as well. No one from the Union appeared to assist Agosto at the July 31 hearing. The notice of hearing dated July 19, 1996 states at the bottom "PLEASE ASK FOR THE COBA ATTORNEY WHEN YOU CHECK IN."

On August 14, Agosto was given notice that she was to appear at the Inspector General's office regarding an investigation. Although COBA informs its members that they "have the right to have a union rep [sic] or attorney present before answering [the Inspector General's] questions," no one from the Union responded to Agosto's requests for representation. While waiting to appear before the Inspector General, however, Agosto saw an attorney from COBA's law firm nearby. When she asked him to represent her, he refused.

On August 27, Guy Anderson, the Corresponding Secretary of COBA, wrote a nearly incomprehensible letter to Agosto in response to her letter of August 12,[7] stating:

1. You have written to Mr. Rangels [sic] office this action follows a thin guideline [sic]. If departmental business is, [sic] revealed charges could be filed by the Dept. take action internally to the DOC [sic].
2. When two additional charges are brought under the Dept. Guidelines and amendment is allowed to charges [sic].
3. Your EEO case is still pending write to EEO an [sic] explain the retaliation that has taken place to update EEO [sic].

The Union contends that this letter informed Agosto that it would not pursue her retaliation grievances because they were related to the sexual harassment complaint.

*Hendrickson's Assault on Agosto*

On September 5, 1996, Hendrickson attacked Agosto and hurt her hand. Agosto immediately reported the incident and her partner escorted her for medical attention. With her partner's assistance, she wrote a memo to the Deputy Warden describing the assault. Agosto wished to file a police report, but the Deputy Warden warned her that if she did so, she would be transferred. The very next day, Agosto learned that effective September 9, she would be transferred to the Court Division. She then called Rexach and advised him of Hendrickson's assault and the transfer. Rexach said that he would check into it, but Agosto never heard anything further. That same day, Agosto submitted an addendum to her report of the previous day to the Deputy Warden. The next day, Hendrickson filed an addendum to his EEO complaint against Agosto. A memo dated September 9 from the Deputy Warden to the DOC Chief for Administration reports that Agosto's allegations regarding the assault are unfounded and recommends that the matter be referred to the Inspector General.

Agosto never returned to work. She sought medical care for her stress and suffering, and filed grievances regarding her treatment by the Health Management Division ("HMD") of DOC.

*Additional Requests for Representation*

On December 6, 1996, Agosto received notice from the HMD advising her of another OATH hearing. On December 27, 1996, Agosto wrote Seabrook to request Union representation and a written explanation of her rights in connection with a disciplinary hearing scheduled for January 15, 1997. She noted that she had a private attorney to represent her, but believed that she was also entitled to Union repre-

---

7. Agosto has not submitted a copy of this letter, but based on the Union's response, the letter apparently requested that the Union assist her in grieving alleged retaliation.

sentation. On December 31, Seabrook wrote to Agosto stating that he was forwarding a copy of her letter to Tim Dillon, the Second Vice President of COBA who handled OATH hearings, and that he had instructed Dillon to contact her as soon as possible. On January 7, Agosto wrote to Seabrook that Dillon had called her on December 31, that she had returned his call on January 3, but that he had not called again. Agosto complained that the Union had not responded to her EEO complaints or her complaints about the transfer from Bellevue, the assault by Hendrickson, and DOC's role in these issues. Seabrook responded in a letter of January 17 that he had forwarded Agosto's letter to Dillon and had requested that he provide her with a written summary of her rights. He also listed the actions he had taken in response to her previous letters. Agosto received a letter from Seabrook dated January 31, asking her to set up an appointment with him to discuss any problems that she was having. When she called the Union to set up the appointment, no one returned her calls.

*Agosto's Arrest*

On February 6, 1997, Agosto and her husband were arrested for impersonating Correction Officers during a traffic stop by New York City police officers for a broken tail light. The charges against Agosto were eventually dismissed. In an "advisory" written by a COBA attorney, COBA instructs its members if arrested to

> [i]mmediately advise the arresting agency that you are represented by an attorney. As soon as you are given the opportunity, you should contact Dienst & Serrins[, the law firm of the COBA attorneys,] ... and an on-call attorney will be advised of your arrest.

Agosto called the Union from the police station and left a message requesting representation at the arraignment. She also made the same request of the union delegate on duty at the Manhattan House of Detention. The Union received a teletype

reporting that Agosto had been arrested and Hendrickson received a copy of it. Hendrickson stated at his deposition that it was "part of [his] duty, when an officer is arrested to go to the precinct and to render whatever assistance that I can." Nonetheless, neither Hendrickson nor anyone else from the Union went to the precinct or the Manhattan House of Detention to assist Agosto.

When no one from COBA appeared at the arraignment, Agosto called her private attorney. After the arraignment, Agosto asked Rexach for a COBA attorney to represent her in the criminal case. Rexach said that "he would take care of it", but when no one from COBA appeared at her next court appearance, Agosto had the lawyer representing her in her employment discrimination claims represent her.

On March 5, 1997, Agosto agreed to forfeit two vacation days to resolve a charge that she had given an incomplete report to the Deputy Warden. The original charge that she had given a false report was withdrawn. These charges stemmed from her explanations given on May 29, 1996 concerning why she had failed to report to work.

*EEOC Determination*

On August 22, 1997, the EEOC issued its determination that COBA had aided and abetted DOC in discriminating against Agosto, that Hendrickson had abused his position as union delegate to harass Agosto, and that COBA knew or should have known of the situation but failed to take remedial action. The determination relied heavily on Hendrickson's statements during its interview of him, and on Agosto's complaints to the Union about Hendrickson. The EEOC found that Hendrickson had used his position as a union delegate to harass Agosto, seizing on her complaint about sexual harassment as a convenient vehicle to carry out his own vendetta against her.[8]

8. The EEOC investigator comments that Hen- drickson disliked Agosto for opposing his can-

On March 27, 1998, Agosto and the City of New York settled her claims against DOC for employment discrimination. Agosto agreed to resign her employment with DOC and DOC agreed to pay Agosto $400,000 in compensatory damages and $9,259.33 in back pay.

## DISCUSSION

Summary judgment may not be granted unless the submissions of the parties taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(c), Fed.R.Civ.P. The moving party bears the burden of demonstrating the absence of a material factual question, and in making this determination the Court must view all facts in the light most favorable to the non-moving party. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). When the moving party has asserted facts showing that the nonmovant's claims cannot be sustained, the opposing party must "set forth specific facts showing that there is a genuine issue for trial," and cannot rest on the "mere allegations or denials" of his pleadings. Rule 56(e), Fed. R. Civ. P; *see also Goenaga v. March of Dimes Birth Defects Found.,* 51 F.3d 14, 18 (2d Cir.1995). In deciding whether to grant summary judgment, therefore, this Court must determine (1) whether a genuine factual dispute exists based on the evidence in the record, and (2) whether the fact in dispute is material based on the substantive law at issue.

Agosto's Amended Complaint, filed by her attorney on June 16, 1999, alleges in four separate causes of action brought pursuant to Title VII that (1) COBA discriminated against Agosto because of her sex by (a) failing to prosecute her sexual harassment grievance against DOC, and (b) by failing to take remedial measures, thereby condoning the continuing discrimination and harassment; (2) COBA caused or·attempted to cause DOC to discriminate (a) when Hendrickson spread rumors about Agosto and otherwise insulted her, and (b) through COBA's refusal to investigate Agosto's complaints regarding Hendrickson; (3) COBA retaliated against Agosto for filing a claim against the Union (a) by failing to investigate Agosto's charges against Hendrickson, (b) by failing to process Agosto's grievances against DOC, and (c) by failing to represent her in various proceedings; and (4) COBA breached its duty of fair representation and denied her equal protection of the law when, motivated by gender animus, it failed to act on Agosto's behalf. Agosto alleges in her fifth cause of action that by retaliating against her, COBA engaged in an unfair labor practice in violation of the National Labor Relations Act. Agosto also brings claims that COBA violated the National Labor Relations Act and the New York State Human Rights Law.

COBA argues that Agosto's Title VII claims should be dismissed principally for the following reasons. It argues that complaints regarding sexual harassment are to be processed through DOC's EEO office and are not part of the grievance process under the Collective Bargaining Agreement ("CBA"). It contends that the conflict between Agosto and Hendrickson was a personal one and had nothing to do with Agosto's gender, but that even if Hendrickson's actions were motivated by her gender, his actions cannot be attributed to the Union. COBA contends it took sufficient action to investigate Agosto's complaints against Hendrickson. Finally, COBA contends that it provided Agosto with the access to representation to which she was entitled and did not breach its obligations to her in this regard. An analysis of the individual claims follows.

didacy as union delegate. The parties do not dispute, however, that Agosto had *supported* Hendrickson's candidacy.

A. *Duty of Fair Representation and Title VII*

█ Agosto argues that COBA failed to represent her fairly because of her gender, or alternatively, for retaliatory reasons, and thereby violated Title VII. A union owes a duty of fair representation to those on whose behalf it acts. This duty derives "from the union's statutory role as exclusive bargaining agent." *Air Line Pilots Ass'n Int'l v. O'Neill,* 499 U.S. 65, 74, 111 S.Ct. 1127, 113 L.Ed.2d 51 (1991). The duty of fair representation was developed in a series of cases involving allegations of racial discrimination by unions, *id.* at 76, 111 S.Ct. 1127, wherein the Supreme Court recognized that " 'the exercise of a granted power to act in behalf of others involves the assumption toward them of a duty to exercise the power in their interest and behalf.' " *Id.* at 74, 111 S.Ct. 1127 (quoting *Steele v. Louisville & Nashville R. Co.,* 323 U.S. 192, 202, 65 S.Ct. 226, 89 L.Ed. 173 (1944)); *see also Vaca v. Sipes,* 386 U.S. 171, 177, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967).

█ The duty of fair representation requires a union " 'to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct.' " *O'Neill,* 499 U.S. at 76, 111 S.Ct. 1127 (quoting *Vaca,* 386 U.S. at 177, 87 S.Ct. 903). A union breaches this duty when its actions are " 'arbitrary, discriminatory, or in bad faith.' " *Id.* at 67, 87 S.Ct. 903 (quoting *Vaca,* 386 U.S. at 190, 87 S.Ct. 903). The actions of a union "are arbitrary only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a wide range of reasonableness as to be irrational." *Id.* (internal quotation omitted). The duty of fair representation applies to all union activity, *id.,* and in all "instances in which a union is acting in its representative role," *id.* at 77, 87 S.Ct. 903.

█ Under Title VII, it is unlawful for a labor union "to exclude or to expel from its membership, or *otherwise discriminate* against, any individual because of his race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(c)(1) (emphasis added). It is well established that a union's breach of its duty of fair representation may subject it to liability under Title VII. *See Cooper v. Wyeth Ayerst Lederle,* No. 98 Civ. 1865(CM), 2000 WL 973628, at *18 (S.D.N.Y. June 9, 2000); *Gorham v. Transit Workers Union of Am., AFL–CIO, Local 100, NYCTA,* No. 98 Civ. 313(JGK), 1999 WL 163567, at *3 (S.D.N.Y. Mar.24, 1999), *aff'd,* 205 F.3d 1322 (2000) (Table); *Nweke v. Prudential Ins. Of Am.,* 25 F.Supp.2d 203, 220 (S.D.N.Y.1998); *Morris v. Amalgamated Lithographers of Am., Local One,* 994 F.Supp. 161, 169 (S.D.N.Y. 1998); *Blaizin v. Caldor Store # 38,* No. 97 Civ. 1604(DAB), 1998 WL 420775, at *2 (S.D.N.Y. July 27, 1998); *Ross v. Communication Workers of Am., Local 110,* No. 91 Civ. 6367(LAP), 1995 WL 351462, at *5– *6 (S.D.N.Y. June 9, 1995), *aff'd,* 100 F.3d 944 (2d Cir.1996)(Table); *Tabois v. CWA Local 1101,* No. 89 Civ. 4921(MBM), 1992 WL 131038, at *4 (S.D.N.Y. June 1, 1992); *Dolittle v. Ruffo,* No. 88–CV–1175, 1990 WL 2648, at *3 (N.D.N.Y. Jan.16, 1990); *Morpurgo v. Board of Higher Ed.,* 423 F.Supp. 704, 717 (S.D.N.Y.1976). For example, a labor union "otherwise discriminate[s]" in violation of Title VII when it fails to represent one of its members in the grievance process because of that member's race, color, religion, sex, or national origin. *See Goodman v. Lukens Steel,* 482 U.S. 656, 667–69, 107 S.Ct. 2617, 96 L.Ed.2d 572 (1987) (holding that union violated Title VII by following a policy of refusing to file grievable racial discrimination claims); [9] *Johnson v. Palma,* 931 F.2d

---

9. The Supreme Court in *Goodman,* 482 U.S. at 667, 107 S.Ct. 2617, declined to address whether the union in that case had violated its duty of fair representation, despite the circuit court's holding that it had, *see Goodman v. Lukens,* 777 F.2d 113, 126 (3d Cir. 1985). It was not until four years later, in *O'Neill,* that the Court explicitly recognized

203, 208 (2d Cir.1991) (holding that a union violates Title VII when it fails to file a grievance alleging discrimination " 'on the ground that the employer looks with disfavor on ... such grievances' " (quoting *Goodman,* 482 U.S. at 669, 107 S.Ct. 2617)); *Ross,* 1995 WL 351462, at *6.

■ The duty of fair representation and Title VII plainly overlap in that they both prohibit discrimination; indeed, some courts essentially equate the two. *See, e.g., Tabois,* 1992 WL 131038, at *4; *see also Nweke,* 25 F.Supp.2d at 220; *Ross,* 1995 WL 351462, at *6. Consequently, where a plaintiff claims that a union violated Title VII based on its failure to represent a member, courts in this Circuit generally incorporate the duty of fair representation as one of the elements of the alleged Title VII violation. *See, e.g., Gorham,* 1999 WL 163567, at *2; *Nweke,* 25 F.Supp.2d at 220–21; *Morris,* 994 F.Supp. at 169; *Ross,* 1995 WL 351462, at *5; *Dolittle,* 1990 WL 2648, at *3. Based on the foregoing, the Court concludes that a union violates Title VII when it breaches its duty of fair representation because of race, color, religion, sex, or national origin.

The test set forth above differs from a test applied frequently in this Circuit which is sometimes referred to as the "*Bugg* test." Prior to the Supreme Court's decision in *O'Neill,* the Seventh Circuit in *Bugg v. International Union of Allied Indus. Workers, Local 507,* 674 F.2d 595 (7th Cir.1982), enunciated a test for evaluating Title VII claims based on a union's failure to represent a member. The Seventh Circuit explained that

> To establish a claim against the Union, the plaintiff was required to show: (1) that the company committed a violation of the collective bargaining agreement with respect to the plaintiff; (2) that the Union permitted that breach to go unrepaired, thus breaching its own duty of fair representation; (3) that there was

that the duty of fair representation applies to all union activity. 499 U.S. at 67, 111 S.Ct.

some indication that the Union's actions were motivated by racial animus.

*Id.* at 598 n. 5; *see also Greenslade v. Chicago Sun–Times, Inc.,* 112 F.3d 853, 866 (7th Cir.1997)(applying same test). This test has been adopted by some courts in this Circuit, *see, e.g., Gorham,* 1999 WL 163567, at *3; *Nolan v. Epifanio,* No. 96 Civ. 2562(JSR), 1998 WL 665131, at *4 (S.D.N.Y. Sept.28, 1998); *Ross,* 1995 WL 351462, at *2, and indeed, was applied by this Court in the December 30, 1998 Opinion and Order denying COBA's motion to dismiss this case. Other courts in this Circuit have modified the *Bugg* test and determined that a plaintiff need establish only the last two elements of this test. *See, e.g., Cooper,* 2000 WL 973628, at *22; *Nweke,* 1998 WL 760176, at *17; *Morris,* 994 F.Supp. at 170; *Doolittle v. Ruffo,* No. 88–CV–1175, 1996 WL 159850, at *4 (N.D.N.Y. Mar.27, 1996).

■ Having had further opportunity to consider the appropriate standard, the Court finds that the *Bugg* test, which arose in the context of an alleged breach of a collective bargaining agreement, is too narrow a statement of the law. A Title VII claim may lie when there is a breach of the duty of fair representation outside the context of a breach of a collective bargaining agreement. There is nothing in the language of Title VII or in the Supreme Court's decision in *Goodman* to suggest otherwise. To the contrary, it is well established that a breach of the collective bargaining agreement is not required to establish a breach of the duty of fair representation. *See, e.g., Breininger v. Sheet Metal Workers Int'l Ass'n,* 493 U.S. 67, 82–83, 110 S.Ct. 424, 107 L.Ed.2d 388 (1989); *Lewis v. Tuscan Dairy Farms, Inc.,* 25 F.3d 1138, 1145 (2d Cir.1994). Furthermore, as the court in *Doolittle* concluded after careful analysis, *see* 1996 WL 159850, at *4, courts in this Circuit, al-

1127.

though citing the first element of the *Bugg* test, have not generally found it necessary to apply it, and thus, reference to this element largely remains *dicta. See, e.g., Nolan,* 1998 WL 665131, at *4; *Ross,* 1995 WL 351462, at *10–*12; *Gorham,* 1999 WL 163567, at *3.

Even those district courts in this Circuit that have applied the modified *Bugg* test were confronted only with allegations that a union breached its duty of fair representation in relation to the grievance process. Consequently, the references to that aspect of the second element of the *Bugg* test that limits Title VII claims to those based on the failure to represent in connection with a breach of a collective bargaining agreement are also *dicta.*

Finally, even the third element of the *Bugg* test is flawed. To the extent that it requires a union's actions to be motivated by discriminatory animus, it is inapplicable to claims against a union under a disparate impact theory of discrimination. For example, in *Goodman,* the Supreme Court held that "[a] union which intentionally avoids asserting discrimination claims . . . so as not to antagonize the employer . . . is liable under . . . Title VII . . . regardless of whether, as a subjective matter, its leaders were favorably disposed toward minorities." *Goodman,* 482 U.S. at 669, 107 S.Ct. 2617 (internal quotation omitted); *see also Gomes v. Avco Corp.,* 964 F.2d 1330, 1335 (2d Cir.1992) (remanding to district court to consider plaintiff's disparate impact discrimination claim based on union's failure to represent).

In sum and to reiterate, all that is required to state a Title VII claim against a union is a breach of the duty of fair representation because of race, color, religion, sex, or national origin.

**B. *Discrimination Based on the Union's Refusal to Process Agosto's Sexual Harassment Complaint Against DOC***

▉▉▉ Agosto argues that the Union discriminated against her in violation of Title VII when it rejected her request to file a sexual harassment grievance against DOC. A union's deliberate refusal to file grievable discrimination claims violates Title VII. *See Goodman,* 482 U.S. at 667–69, 107 S.Ct. 2617; *see also Johnson,* 931 F.2d at 207 (refusal to proceed with grievance process because of the filing of an EEOC complaint constitutes retaliation in violation of Title VII); *Morris,* 994 F.Supp. at 170. A plaintiff attempting to establish such a violation of Title VII need not prove discriminatory animus. *See Goodman,* 482 U.S. at 669, 107 S.Ct. 2617.

The Union argues that because the CBA does not prohibit sexual harassment, sexual harassment is not grievable. The Union contends that sexual harassment complaints must instead be referred to DOC's EEO office.

The CBA defines a grievance, in relevant part, as

> a claimed violation, misinterpretation or misapplication of the rules, regulations, or procedures of the agency affecting terms and conditions of employment, provided that . . . the term "grievance" shall not include disciplinary matters.

CBA Art. XXI, Section 1(b). DOC has had an EEO policy prohibiting sexual harassment in place since at least 1993. The policy is enforced through Departmental rules and regulations.[10] Furthermore, sexual harassment affects an employee's work environment, which is a term or condition of employment. *See Harris v. Forklift Systems, Inc.,* 510 U.S.

---

10. For example, a DOC Policy Statement provides that "ANY MEMBER OF THE DEPARTMENT WHO IS FOUND TO HAVE ENGAGED IN CONDUCT WHICH CONSTITUTES SEXUAL HARASSMENT WILL BE DISCIPLINED UNDER DEPARTMENTAL RULES AND REGULATIONS. SUPERVI-SORS WHO EITHER CONDONE OR FAIL TO ACT PROMPTLY TO CORRECT INAPPROPRIATE CONDUCT BROUGHT TO THEIR ATTENTION WILL BE SUBJECT TO DISCIPLINARY ACTION." (Emphasis in original.)

17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993); *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 73, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). Based on this record, sexual harassment is a grievable offense.

COBA presents a number of arguments against this conclusion. First, COBA argues that sexual harassment charges can not be grievable since the Union is not "in control of the workplace." COBA lists "being assigned to work not in your job title without compensation, not getting assignment or longevity differentials due, payroll or overtime problems, or health or safety issues" as "typical grievable offenses." By intervening in any of these listed disputes, the Union exercises some degree of control over the workplace. Nor is there any stark distinction between health and safety issues and sexual harassment, all of which impact an employee's work environment. Indeed, pervasive sexual harassment may become a health or safety issue, as is amply illustrated by Agosto's evidence that her fellow officers would not come to her aid when an inmate threatened to attack her.

The Union also argues that sexual harassment is not grievable because of the provision of the CBA excluding "disciplinary matters" from the grievance process. It is unclear precisely what is meant by this exclusion and the Union provides no further analysis. In any event, the sexual harassment of which Agosto complains here included many incidents which were entirely independent of any "disciplinary matter."

■ Finally, the Union asserts that the grievance of sexual harassment complaints could "result in contradictory conclusions by the DOC and the Union." As both *Goodman* and *Johnson* make clear, however, a union's preference to avoid conflict with an employer over issues of discrimination is not a defense to a Title VII claim.

Recognizing both that a union has no absolute duty to pursue all grievances, *see Vaca,* 386 U.S. at 191, 87 S.Ct. 903; *Lew-*

*is,* 25 F.3d at 1143; *Barr v. U.P.S., Inc.,* 868 F.2d 36, 43–44 (2d Cir.1989), and that any examination of its performance must be "highly deferential," *O'Neill,* 499 U.S. at 78, 111 S.Ct. 1127, the Court finds that Agosto's claim must nonetheless be allowed to proceed to trial. COBA has offered no explanation for its refusal to process Agosto's grievance aside from its policy not to prosecute sexual harassment grievances.

### C. *Causing or Attempting to Cause a Hostile Work Environment*

In her second claim for relief, Agosto argues that Hendrickson aided and abetted DOC in the creation of a hostile work environment, thus subjecting the Union to liability under Title VII's prohibition against a union's causing or attempting to cause an employer to discriminate. Title VII expressly provides that a union may not "cause or attempt to cause an employer to discriminate against an individual in violation of this section." 42 U.S.C. § 2000e–2(c)(3); *see Goodman,* 482 U.S. at 667, 107 S.Ct. 2617. This provision of Title VII recognizes that unions may "bear significant responsibility for discriminatory practices that" Title VII was designed to prohibit. *Northwest Airlines, Inc. v. Transport Workers Union of Am., AFL–CIO,* 451 U.S. 77, 90, 101 S.Ct. 1571, 67 L.Ed.2d 750 (1981); *see also United Steelworkers of Am. v. Weber,* 443 U.S. 193, 202–06, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979)(discussing legislative history and purposes of Title VII); *Air Line Pilots Ass'n Int'l v. Trans World Airlines, Inc.,* 713 F.2d 940, 956 (2d Cir.1983)(holding union liable for causing or attempting to cause employer to discriminate in violation of the Age Discrimination in Employment Act ("ADEA") where it had campaigned to persuade the employer to retain a discriminatory retirement policy, opposed the employer's efforts to attempt partial compliance with the ADEA and induced the employer to impose further discriminatory restrictions on employees), *aff'd in part and rev'd in part on other grounds, Trans*

*World Airlines, Inc. v. Thurston,* 469 U.S. 111, 105 S.Ct. 613, 83 L.Ed.2d 523 (1985).

To prevail on this claim, Agosto must show (1) the existence of a hostile work environment, (2) that Hendrickson caused or attempted to cause that hostile work environment, and (3) that Hendrickson's conduct may properly be imputed to the Union. *See generally Howley v. Town of Stratford,* 217 F.3d 141, 153–54 (2d Cir.2000)(addressing first and third elements in a claim against an employer). A hostile work environment exists where the workplace "is permeated with 'discriminatory intimidation, ridicule, and insult . . . that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' " *Id.* at 153 (quoting *Harris,* 510 U.S. at 21, 114 S.Ct. 367).

COBA contends that any incidents that occurred in the workplace were not severe or pervasive, that Hendrickson's comments were not based on Agosto's gender, and that his actions are not attributable to the Union. The Court finds that there are genuine disputes as to each of these factual assertions. Agosto has offered sufficient evidence for a factfinder to conclude not only that a hostile work environment generally existed, but also that Hendrickson's conduct alone intolerably altered Agosto's work environment. *See id.,* at 154. And while Agosto has offered sufficient evidence that Hendrickson's conduct was motivated by her gender, regardless of whether he was so motivated, she has offered evidence that his comments were designed to create hostility toward her based on her gender.

As to the third issue, the Union has not offered any evidence to rebut Agosto's proof that Hendrickson's conduct may be imputed to the Union. In a conclusory fashion, COBA simply asserts that the "union is not responsible for the independent actions of corrections officers in the workplace" and that Hendrickson was not acting within the scope of his authority as a union delegate when the incidents oc-

curred. The parties have not otherwise addressed what standard a court should apply in determining a union's liability where the individual who allegedly caused or attempted to cause the hostile work environment is a union delegate.

▮▮▮▮▮ In the case of an employer, knowledge of sexual harassment between coworkers triggers a duty to take reasonable steps to correct the behavior, including conducting an investigation. *See Malik v. Carrier Corp.,* 202 F.3d 97, 104 (2d Cir.2000). A failure to do so may subject the employer to liability. *See id.* at 105. The Second Circuit has stated that

> [w]ith respect to conduct between fellow employees, an employer is responsible for acts of sexual harassment in the workplace *where the employer* (or its agents or supervisory employees) *knows or should have known of the conduct,* unless it can show that it took immediate and appropriate corrective action.

*Id.* at 105 (quoting 29 C.F.R. § 1604.11(d))(emphasis added). The knowledge of company officials of the alleged harassment is imputed to the employer in accordance with agency principles. *Id.* at 105–06. For example, where the official who has notice of the harassment had the duty to terminate the harassment, knowledge is imputed to the employer. *See Torres v. Pisano,* 116 F.3d 625, 637 (2d Cir.1997). Regardless of notice, where a hostile work environment is created by a supervisor "with (immediate or successively higher) authority over the employee," subject to an affirmative defense, the employer is vicariously liable to the victimized employee. *Faragher v. City of Boca Raton,* 524 U.S. 775, 807, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998); *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 765, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998); *see also Malik,* 202 F.3d at 106; *Torres,* 116 F.3d at 636–37.

Few courts have addressed the question as to what extent these same agency principles should guide an analysis of a union's

liability under Title VII based on the actions of union delegates or officers. In a case similar to the instant one, but involving racial harassment by union officials in violation of state law, the Ninth Circuit saw "no reason why a union should not be equally liable for its acts of racial harassment against its own members" where a union, like an employer, had "assumed responsibility for preventing discrimination in terms and conditions of employment." *Woods v. Graphic Communications*, 925 F.2d 1195, 1201 (9th Cir.1991). The Ninth Circuit proceeded to apply agency principles to the defendant union and held that the union was liable where it "had both actual and constructive notice of the pervasively hostile environment and the acts of [a union steward]" and where there was "no indication that any action was taken by the Union against [the steward]." *Id.* at 1202 (applying Title VII principles to state law claim).

■ The Court finds that applying these agency principles to the Union serves the purposes of Title VII by increasing the protection for employees against discrimination by unions in the workplace. Nor is this application of agency law to unions unusual. Courts routinely apply common law principles of agency to unions in other contexts. *See, e.g., Carbon Fuel Co. v. United Mine Workers of Am.*, 444 U.S. 212, 216–17, 100 S.Ct. 410, 62 L.Ed.2d 394 (1979); *Lewis*, 25 F.3d at 1142, 1144. As discussed above, however, a union's liability under Title VII rests on the union's duty of fair representation, or in other words, its duty in relation to all union activity to treat all members "without hostility or discrimination . . . [in] complete good faith and honesty, and to avoid arbitrary conduct." *Vaca*, 386 U.S. at 177, 87 S.Ct. 903. Accordingly, the Court concludes that for a union representative's role in causing or attempting to cause a hostile work environment to be properly imputed to a union, a plaintiff must show not only that the union had actual or imputed knowledge of the im-

proper conduct, but also that the union representative's conduct related to union activity and that therefore, in acting in such a manner, the representative breached the duty of fair representation.

■ Under the preceding principles, the Union's argument that any harassing conduct by Hendrickson cannot be attributed to the Union because such conduct was not within the scope of his authority as a Union delegate must be rejected. As the Supreme Court discussed in *Faragher* and *Ellerth*, liability under Title VII does not hinge on whether the individuals who created the actionable hostile work environment were acting within the scope of their authority in doing so. *See Faragher*, 524 U.S. at 799, 807, 118 S.Ct. 2275; *Ellerth*, 524 U.S. at 756–57, 118 S.Ct. 2257. Instead, "the minimum standard for employer liability under Title VII is negligence," under which standard an employer may be liable for sexual harassment "if it knew or should have known about the conduct and failed to stop it." *Ellerth*, 524 U.S. at 759, 118 S.Ct. 2257.

Agosto has offered sufficient evidence to allow a factfinder to conclude that the Union is responsible for Hendrickson's conduct. Agosto has offered evidence that rather than using his authority as a union delegate to assist Agosto in eliminating sexual harassment as he was required to do, Hendrickson used this authority to harass her, thus breaching the duty of fair representation. The Union's failure to take any action against Hendrickson, despite Agosto's filing of grievances against him, also amounts to a breach of the duty of fair representation. Moreover, there is no question that the Union had both actual and imputed knowledge of Hendrickson's conduct. There is undisputed evidence that Agosto complained directly to the Union about Hendrickson, giving the Union actual knowledge of Hendrickson's role in causing the alleged hostile work environ-

ment.[11] Accordingly, Agosto may proceed to trial on her claim that the Union caused or attempted to cause a hostile work environment.

## D. *Retaliation*

■■■■■ Agosto contends that COBA retaliated against her for her February 1996 EEO/DOC complaint against DOC and for her July 1996 EEOC complaint against the Union. She cites the Union's failure to investigate her complaints against DOC and against Hendrickson, and its failure to provide her with representation in administrative proceedings. A union member who opposes an employer's unlawful employment practice is protected by Title VII from retaliation by her union. *See* 42 U.S.C. § 2000e–3(a); *Johnson,* 931 F.2d at 207. To make out a prima facie case of retaliation by a union, a plaintiff must show that (1) she was engaged in an activity protected under Title VII and known to the union; (2) she suffered adverse union action; and (3) there was a causal connection between the protected activity and the union's actions. *See Yerdon v. Henry,* 91 F.3d 370, 377 (2d Cir.1996); *Malarkey v. Texaco, Inc.,* 983 F.2d 1204, 1213 (2d Cir.1993); *Johnson,* 931 F.2d at 207. "The term 'protected activity' refers to action taken to protest or oppose statutorily prohibited discrimination." *Cruz v. Coach,* 202 F.3d 560, 566 (2d Cir.2000). Once the plaintiff makes out a prima facie case, it is the defendant's burden to articulate a "legitimate, nondiscriminatory reason for its actions." *Johnson,* 931 F.2d at 207 (internal quotation marks and citation omitted). Should the defendant meet this burden, the plaintiff must then show that the reasons the defendant advanced were pretextual. *See id.*

■■■■ For purposes of this motion, COBA does not dispute that Agosto engaged in protected activity known to the Union. It does dispute, however, that Agosto suffered any adverse action as a result of protected activity. An adverse action by a union "is one that affects the terms, privileges, duration, or conditions of employment." *Yerdon,* 91 F.3d at 378 (internal quotation omitted). It includes any breach of the duty of fair representation, *see Morris,* 994 F.Supp. at 170, including the failure to pursue a grievance and the failure to enforce rights under a collective bargaining agreement, *see Johnson,* 931 F.2d at 207. A causal connection may be established either "indirectly by showing that the protected activity was closely followed in time by the adverse action," *Manoharan v. Columbia Univ. College of Physicians and Surgeons,* 842 F.2d 590, 593 (2d Cir.1988), or " 'through other evidence such as disparate treatment of fellow employees who engaged in similar conduct, or *directly* through evidence of retaliatory animus directed against a plaintiff by the defendant,' " *Johnson,* 931 F.2d at 207 (quoting *DeCintio v. Westchester County Medical Ctr.,* 821 F.2d 111, 115 (2d Cir.1987)(emphasis in original)).

■■■■ Agosto has presented sufficient evidence to raise issues of fact to entitle her to proceed with her claims that the Union retaliated against her when it (1) failed to prosecute her claim against DOC that she was the victim of sexual harassment, and (2) failed to investigate her complaints against Hendrickson. Her third example of retaliatory treatment—that the Union failed to provide her with the representation to which she was entitled at administrative proceedings—requires more extended discussion.

---

**11.** Since there is ample evidence of notice of Hendrickson's conduct to the Union's officers, and in the absence of any discussion by the parties of this issue, it is unnecessary for the Court to resolve at this time whether discrimination by a union delegate requires actual knowledge or whether knowledge is properly imputed to the union in such cir-

cumstances. It bears noting, however, that it may be appropriate to impute knowledge to the union when a union delegate discriminates, because, among other reasons, a delegate is the official through whom members lodge sexual harassment grievances. *See Torres,* 116 F.3d at 637 (employer liability); *Woods,* 925 F.2d at 1202 (union liability).

COBA is required to provide different levels of representation in different settings. According to COBA, it provides a delegate for "corrective interviews"; an attorney for unrepresented members at OATH hearings; an attorney following arrests; and legal assistance in certain civil matters, such as referring EEO matters to appropriate federal or state agencies. Agosto contends that she asked COBA for representation for four occasions.

On May 21, 1996, Agosto requested representation at a Corrective Interview and told Rexach that Hendrickson should not be the person to represent her. The Union responds that there were a total of three union representatives who could represent Agosto and that it was Agosto's responsibility to obtain the assistance of someone who she believed would be an appropriate representative. Agosto does not dispute this assertion, and therefore the failure to provide representation for the Corrective Interview does not constitute retaliation.

Agosto asserts in conclusory terms that she requested representation at a June 4 "Command Discipline Hearing." Agosto has not identified when or to whom she communicated this request. Her written communications with the Union of May 24 and June 4 concern this hearing but do not include a request for representation. Agosto's conclusory allegation that the Union failed to respond to her requests for representation at this hearing is insufficient to create a genuine issue of material fact.

On July 11, 1996, Agosto requested representation for a July 31 OATH hearing. She advised the Union, however, that she had her own attorney. On the day of the hearing, she saw a union attorney at the hearing building itself and repeated her request for representation. The Union explains that her requests were refused since she already had counsel. Agosto does not dispute that it is the Union's customary practice not to provide additional representation when its members have their own attorneys, she merely argues that she was unaware of this policy. In the absence of any evidence that the Union's explanation is pretextual, this portion of Agosto's claim must fail. Agosto's other allegations that she requested but did not receive representation at various administrative proceedings are too conclusory to survive summary judgment.

Finally, Agosto asserts that she requested representation after her arrest on February 6, 1997, but that COBA did not provide her with an attorney.[12] COBA does not dispute that members receive free legal representation if they are arrested and that the Union, as a courtesy, will contact the attorneys on a member's behalf. Hendrickson has admitted that he received a teletype reporting Agosto's arrest and that it was his duty to assist members after an arrest. The Union argues only that any failure to arrange for Agosto's representation after her arrest was merely the result of negligence. This is a question of fact that may not be resolved on summary judgment.

E. *New York State Executive Law Claims*

▮▮▮▮▮▮ The Union contends that Agosto's state law claim alleging discrimination and retaliation in violation of the New York State Human Rights Law is preempted by federal law. State law claims are preempted if they arise out of or are encompassed by a breach of the duty of fair representation. *See Welch v. General Motors Corp., Buick Motor Div.,* 922 F.2d 287, 294 (6th Cir.1990)(state law disability statute); *Peterson v. Air Line*

---

**12.** Agosto's amended complaint proceeds solely on the theory that the union retaliated against her by failing to represent her in a "variety of administrative forums." The parties nonetheless conducted discovery on the lack of representation at the time of the arrest and the Union addressed Agosto's evidence regarding this issue in its memorandum in support of this motion. There being no prejudice, therefore, the pleading is deemed amended to conform to the evidence pursuant to Rule 15(b), Fed.R.Civ.P.

*Pilots Ass'n Int'l,* 759 F.2d 1161, 1169 (4th Cir.1985)(state laws against civil conspiracy, blacklisting, and interferences with a contractual relationship); *Condon v. Local 2944, United Steelworkers of America, AFL–CIO,* 683 F.2d 590, 595 (1st Cir. 1982)(state common law duty of care in conducting safety inspection); *Rodolico v. Unisys Corp.,* No. CV 95–3653(ADS), 2000 WL 530724, at *3–*6 (E.D.N.Y. May 1, 2000)(New York Human Rights Law); *Snay v. United States Postal Serv.,* 31 F.Supp.2d 92, 99 (S.D.N.Y.1998)(same). Since Agosto's state law claims of discrimination and retaliation are premised on the duty of fair representation, they are preempted.

Although COBA moved to dismiss Agosto's entire complaint, it has not described the basis for dismissal of Agosto's fourth and fifth claims, and therefore, the Court does not reach these claims.

## CONCLUSION

For the reasons stated, defendant's motion for summary judgment is denied except as to (1) that aspect of plaintiff's third cause of action relating to the Union's failure to represent the plaintiff in various administrative proceedings, and (2) plaintiff's sixth cause of action alleging violations of the New York State Human Rights Law. A scheduling order accompanying this Opinion shall govern the future conduct of this litigation.

SO ORDERED.